*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* C. BLANSET, Minor.

UNPUBLISHED
June 11, 2019

No. 346326
Calhoun Circuit Court
Family Division
LC No. 2017-000422-NA

Before: METER, P.J., and JANSEN and M. J. KELLY, JJ.

PER CURIAM.

Respondent-mother appeals as of right the trial court's termination of her parental rights to her biological child, CB.[1] We affirm.

## I. BACKGROUND

At her premature birth in June 2016, CB tested positive for amphetamine, methamphetamine, TCH, and opiates. CB was removed from respondent's care in February 2017 after Child Protective Services visited respondent's home and observed components commonly used in the production of methamphetamine. Respondent's brother—the self-professed best methamphetamine cook in the county—was also living in the home. CB was placed in nonrelative foster care and the trial court ordered respondent to comply with and benefit from reunification services. Respondent failed to do so and, in June 2018, petitioner filed a petition to terminate respondent's parental rights to CB; evidentiary hearings on the motion were held between September and October 2018.

Between the initial removal and the final termination hearing, respondent was offered 93 drug screenings. Respondent only showed for 33 of these screenings and, of those 33, tested positive for controlled substances at 25. Caseworkers informed respondent that missed screenings would be presumed to have returned positive results; thus, respondent returned

---

[1] The trial court also terminated the parental rights of CB's father. CB's father, however, is not a party to this appeal.

positive results for 85 of 93 drug screenings. By the start of the termination hearings, respondent had still failed to start any substance-abuse treatment. Moreover, respondent was offered 87 parenting-time visits with CB, but attended only 45. Early in this case, respondent completed a parenting course and would engage appropriately with CB during visits. During the latter visits, however, respondent was distant and withdrawn, often playing a video on her phone instead of engaging CB.

Respondent blamed her lack of attendance at these services on transportation issues. Nonetheless, caseworkers testified that petitioner offered respondent extensive transportation services, including gas cards, bus passes, train passes, and direct rides. Respondent, however, would not take advantage of these services. Caseworkers attempted to evaluate respondent's home on several occasions, but its inhabitants would not allow them to enter. In May 2018, caseworkers were finally able to visit the home and reported that multiple people were present there, whom respondent refused to identify. The home was filthy and respondent's aforementioned brother appeared to be living there. Additionally, an unidentified woman was found looking anxious and ill; she was frantically pulling her sleeves down like she had just used drugs. Respondent was not cooperative with caseworkers during the visit. Sometime after the May 2018 visit, respondent appears to have moved into her mother's home.

Caseworkers reported that respondent had an "emotional break" after one of the earlier proceedings and she assaulted two police officers. Respondent was arrested after the outburst and "two or three officers" pinned her to the ground while she continued to struggle with them. At the time of the last termination hearing, respondent was incarcerated for her drug use, which was a probation violation on an earlier conviction.

The trial court found statutory grounds to terminate respondent's parental rights to CB under MCL 712A.19b(3)(c)(*i*), (g), and (j) and concluded that termination was in CB's best interests. This appeal followed.

## II. ANALYSIS

As noted previously, the trial court terminated respondent's parental rights to CB under the following provisions of MCL 712A.19b(3), which provide that a trial court may terminate a parent's parental rights if it finds any of the following:

> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds[:]

> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

> * * *

> (g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable

expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

* * *

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

"In order to terminate parental rights, the trial court must find by clear and convincing evidence that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been met." *In re VanDalen*, 293 Mich App 120, 139; 809 NW2d 412 (2011). Once a ground for termination is established, the trial court must order termination of parental rights if it finds that termination is in the child's best interests. *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012); MCL 712A.19b(5). "We review for clear error both the court's decision that a ground for termination has been proven by clear and convincing evidence and, where appropriate, the court's decision regarding the child's best interest." *In re Trejo*, 462 Mich 341, 356-357; 612 NW2d 407 (2000); see also MCR 3.977(K). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re BZ*, 264 Mich App 286, 296-297; 690 NW2d 505 (2004).

Regarding the trial court's statutory-grounds findings, respondent argues only that the trial court erred because she is not a "constant and daily user of illegal substances" and her drug use "was not at the level that deprived [CB] of proper care." We disagree. To recap, respondent received positive results for 85 of 93 drug screenings. Despite receiving transportation services, respondent failed to attend almost half of her scheduled parenting-time sessions with CB. Respondent was violent with police officers after a court hearing, appeared to be housing a known methamphetamine producer, and appeared to be allowing drug use in her home. Respondent's home and lifestyle were chaotic and it follows that respondent could not provide a safe, appropriate home for the child.

The trial court did not err by finding that the conditions leading to adjudication continued to exist, that respondent was unable to provide proper care and custody for the child, and that the child would be endangered if returned to respondent. Given that, after more than a year of services, respondent was in no better position to care for CB, there was no indication that respondent would be able to provide a suitable environment for the child within any reasonable amount of time. In short, MCL 712A.19b(3)(c)(*i*), (g), and (j) supported termination of respondent's parental rights.

Regarding CB's best interests, respondent argues that there was a bond between her and the child and that petitioner should have taken respondent's learning disability "into account before proceeding to terminate her parental rights." Despite respondent's assertion, caseworkers reported that they took special care with respondent because of her learning disability, often explaining matters in greater depth to respondent than they would have with other parents. Although there did appear to be a bond between CB and respondent, this bond weakened by the end of the proceedings. Respondent makes much of the fact that CB was in a nonrelative

placement[2] and argues that termination "means that [respondent] will no[] longer have the ability to interact with her child and maintain contact." Yet, in the time CB was out of respondent's care, respondent failed to attend nearly half of her scheduled parenting-time sessions with the child. Indeed, respondent's assertion of a strong bond at the time of termination is dubious given that respondent would often play a video on her phone during the parenting-time sessions she did attend instead of interacting with the child.

Again, the record in this case leads to one inescapable conclusion: respondent was unlikely to be able to provide CB with a safe, appropriate home within any reasonable time. Despite months of services, respondent failed to address her substance-abuse issues, made her home a haven for those who manufacture and abuse substances, and made little effort to reunify with her child. In contrast, caseworkers reported that CB was attached to her foster mother and looked to the foster mother for guidance, love, support, and affection. Moreover, CB was hitting all of her developmental milestones in foster care and regularly attended church and social outings with her foster family. While a preadoptive relative placement would have been ideal, termination cases do not often produce ideal outcomes. Given that CB was "thriving" in foster care, we agree with the trial court that termination was in CB's best interests.

Affirmed.

/s/ Patrick M. Meter
/s/ Kathleen Jansen
/s/ Michael J. Kelly

---

[2] Respondent also argues that CB's placement was nonadoptive. Respondent's caseworker testified, however, that CB's placement was preadoptive.