*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* CAGLE, Minors.

UNPUBLISHED
February 13, 2020

No. 350253
Osceola Circuit Court
Family Division
LC No. 17-005383-NA

Before: SAWYER, P.J., and MARKEY and STEPHENS, JJ.

PER CURIAM.

Respondent appeals as of right the trial court's order terminating her parental rights to the minor children, BDC and NLC, under MCL 712A.19b(3)(c)(*ii*) (failure to rectify other conditions)[1] and (j) (reasonable likelihood of harm if returned to the parent).[2] We affirm.

## I. FACTS

On July 13, 2018, the Department of Health and Human Services (DHHS) filed a petition requesting the children's removal from the home, in part because respondent's apartment was "covered in dog feces, garbage and soiled diapers." Respondent pleaded no contest to the allegations in the petition. The trial court accepted respondent's plea and took jurisdiction over BDC and NLC. The trial court ordered respondent to (1) work toward getting her GED; (2) find independent, appropriate housing; (3) find employment; (4) get her driver's license; and (5) participate in counseling at Community Mental Health (CMH). Respondent participated in a psychological evaluation in November 2018, where respondent indicated that she experienced emotional abuse, physical abuse, and sexual abuse when she was younger. The doctor who authored the psychological evaluation testified that it would take respondent "multiple years" of

---

[1] Although DHHS sought the termination of respondent's parental rights under MCL 712A.19b(3)(c)(*i*) and (*ii*), it is unclear whether the trial court terminated respondent's rights under MCL 712A.19b(3)(c)(*i*).

[2] Two other children, EAH and BCC, were also born to respondent, but the trial court did not terminate respondent's rights to these children.

treatment to address her issues. Respondent was also diagnosed with "major depressive disorder severe recurrent episode and mild intellectual disability." On May 2, 2019, DHHS filed a supplemental petition requesting the termination of respondent's parental rights. Following a termination hearing, the trial court ultimately concluded that respondent's "lack of progress" and "failure to comply with any of the services provided" supported the termination of her parental rights.

## II. REASONABLE EFFORTS

Respondent argues that DHHS failed to tailor services based on her "cognitive limitations." We disagree.

Respondent did not object to the nature of the services or accommodations at the time the case service plan was adopted, so respondent's issue is unpreserved. *In re Frey*, 297 Mich App 242, 247; 824 NW2d 569 (2012). We review respondent's unpreserved issue for "plain error affecting substantial rights." *In re Utrera*, 281 Mich App 1, 8; 761 NW2d 253 (2008). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) the error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *In re VanDalen*, 293 Mich App 120, 135; 809 NW2d 412 (2011) (quotation marks and citation omitted). "Generally, an error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings." *In re Utrera*, 281 Mich App at 9.

Generally, "the [DHHS] has an affirmative duty to make reasonable efforts to reunify a family before seeking termination of parental rights." *In re Hicks/Brown*, 500 Mich 79, 85; 893 NW2d 637 (2017), citing MCL 712A.18f(3)(b) and (c); MCL 712A.19a(2). In order to make reasonable efforts, DHHS adopts a service plan aimed at rectifying the conditions that caused the child's removal. *In re Fried*, 266 Mich App 535, 542; 702 NW2d 192 (2005). See also MCL 712A.18f(3)(d) (stating that the service plan shall include a "[s]chedule of services to be provided to the parent . . . to facilitate the child's return to his or her home"). Further, "[p]ublic entities, such as [DHHS], must make 'reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless . . . the modifications would fundamentally alter . . . the service' provided." *In re Hicks/Brown*, 500 Mich at 86, quoting 28 CFR 35.130(b)(7) (2016). Although "[DHHS] has a responsibility to expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of the respondent[] to participate in the services that are offered" and "demonstrate that [he or she] sufficiently benefited from the services provided." *In re Frey*, 297 Mich App at 248.

Respondent first argues that it was unreasonable to require her to pass the GED test because she would have needed "supportive services and accommodation and likely, individualized support." However, respondent did not make any attempt to comply with this requirement. Respondent took a test to show what tests she needed help with when studying for the GED test. Although respondent knew that she was supposed to follow up with DHHS after taking the test, she did not do so because she claimed that she did not have the money to purchase the books needed to study for the GED test or the funds to take the test. However, a DHHS foster care worker testified that she told respondent that DHHS would pay for her to rent the books. Because

respondent did not even begin to attempt to study for the GED, it is unclear what services she would have received while studying for the GED.

Respondent also argues that DHHS should have "[modified] the expectation and [provided] services for her to become self-sustainable without employment" rather than requiring her to get her GED and a job. The trial court noted that because respondent was not employed, she did not have the resources to provide for BDC and NLC. Respondent received public assistance, but there were several times throughout the course of the proceedings when she ran out of food in the middle of the month, and DHHS had to refer her to different food pantries. Contrary to respondent's assertion, the trial court did not find it "problematic" that respondent used free resources. Rather, the trial court stated that respondent "[lacked] the availability of resources to provide for [BDC and NLC]."

In terms of counseling services, the trial court focused on how respondent "minimized [her] first two intake sessions" at CMH. Respondent was initially denied services at CMH, which was likely because she was dishonest at her first intake. Respondent had a second intake after the foster care worker spoke with CMH. However, respondent only participated in case management services approximately once per month until January 2019. She did not participate in counseling services at CMH during this time even though she could have and, in fact, was asked "several times" to do so.

At some point, respondent had to transfer to a different CMH location because she moved. The foster care worker testified that respondent told her that she called the new CMH location and that "for several months" respondent told her that "she was waiting for CMH to call her back and either complete her Intake or schedule something[.]" The foster care worker "kept encouraging her" to keep calling CMH because respondent might have needed to complete another intake. The foster care worker was not able to call CMH to schedule an appointment for respondent. However, Maternal Infant Health helped respondent complete another intake in April 2019. Respondent argues that "[a] referral or telling [respondent] she needed to do something [was] not sufficient." However, respondent did not present any evidence to explain why she could not follow up with CMH rather than waiting until Maternal Infant Health became involved.

Respondent asserts that she secured her own housing. At the time of the termination hearing, respondent was living in a trailer, but it was in someone else's name, which meant that she could not control who was in the trailer. Although there was a plan to have respondent's name solely on the lease, the trial court was concerned about whether respondent would be able to afford the rent payments. Furthermore, the trial court noted that "[h]ousing [had] been a consistent issue through this case." Respondent had significant fines after she was evicted from her apartment, which impacted her ability to find other housing because apartment complexes or landlords did not want to lease to her. Further, respondent moved multiple times over the course of the proceedings, including living with her mother and brother. However, her mother's trailer was "unsuitable" because the mother was on the "Central Registry list," and her brother would not allow DHHS into his trailer.

The trial court did not plainly err by finding that "[respondent's] abilities were matched appropriately to the services offered by the attention from . . . DHHS." The foster care worker and

the Child Protective Services (CPS) investigator testified that they often explained why respondent needed to participate in services and the benefit she would receive by participating. The foster care worker helped respondent apply for cash assistance with DHHS, but respondent missed her appointment. DHHS paid for respondent to take her driving test and a rental car for her to use during the test. Although respondent did not pass the test, respondent was encouraged to seek assistance if she needed transportation. Respondent sought assistance a few times, but usually did so in an untimely manner. She would also sometimes say that her mother was going to drive her, but then later say her mother was not going to drive her.

Further, we note that additional or increased tailored services would not address all of respondent's barriers. The testimony at the termination hearing demonstrated that respondent showed minimal progress despite being provided, and even being engaged in, several services. We are not persuaded that respondent would have fared better even if DHHS offered other services. *In re Fried*, 266 Mich App at 543. Accordingly, the trial court did not plainly err by concluding that DHHS made reasonable efforts to preserve and reunify the family.

## III. BEST INTERESTS

Respondent argues that the trial court committed error requiring reversal by determining that terminating respondent's parental rights was in the best interests of BDC and NLC. We disagree.

We review the trial court's determination that termination is in the children's best interests for clear error. *In re Schadler*, 315 Mich App 406, 408; 890 NW2d 676 (2016). "A finding is clearly erroneous if, although there is evidence to support it, [this Court is] left with a definite and firm conviction that a mistake has been made." *Id.* (quotation marks and citation omitted).

When determining whether termination is in the best interests of the child, the trial court should place its "focus on the child rather than the parent." *In re Schadler*, 315 Mich App at 411. "[T]he court may consider the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Olive/Metts Minors*, 297 Mich App 35, 41-42; 823 NW2d 144 (2012) (citations omitted). "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *In re White*, 303 Mich App 701, 714; 846 NW2d 61 (2014).

Although respondent had a bond with BDC and NLC, the trial court focused on how respondent failed to comply with her case service plan and the services provided to her. In particular, respondent failed to address her trauma, which impacted her ability to be able to care for BDC and NLC. Further, respondent had a history of being in abusive relationships, several of which involved domestic violence. She also had a difficult time balancing the needs of all of her children. In particular, respondent had a difficult time attending to BDC's needs. The trial court stated that BDC and NLC needed permanency and stability. Ultimately, the trial court concluded that it would be in the best interests of BDC and NLC to be adopted together and that there was

no alternative because respondent was "not capable" of caring for BDC and NLC, and she had an "unreliable support system." These findings are not clearly erroneous.

Affirmed.

/s/ David H. Sawyer
/s/ Jane E. Markey
/s/ Cynthia Diane Stephens