*In re* VanDALEN

Docket Nos. 301126 and 301127. Submitted June 7, 2011, at Detroit. Decided June 16, 2011, at 9:05 a.m.

The Department of Human Services petitioned the Monroe Circuit Court, Family Division, to take jurisdiction of two minor children of respondent-mother D. Leader and respondent-father G. VanDalen, alleging that the children had been abused. Later, petitioner amended its petition to also seek termination of respondents' parental rights. The court, John A. Hohman, Jr., J., acquired jurisdiction over the children following an adjudicative proceeding before a jury. After a dispositional hearing, the court found that the evidence clearly and convincingly established grounds for termination under MCL 712A.19b(3)(g) (failure to provide proper care and custody) and MCL 712A.19b(3)(j) (reasonable likelihood that child will be harmed if returned to the parents' home). The court further found that termination was clearly in the children's best interests under MCL 712A.19b(5) and terminated respondents' parental rights. Respondents appealed separately, and the Court of Appeals consolidated the appeals.

The Court of Appeals *held*:

1. Parents have a due-process liberty interest in caring for their children. When assessing whether that right was violated, the question is whether the procedures used were constitutionally adequate. There is no requirement that the jurors deciding whether the court should take jurisdiction of a child must reach a consensus regarding which specific statutory grounds for termination alleged in the petition were proved. Jurisdiction exists as long as five jurors find that the petitioner proved one or more statutory grounds for jurisdiction. Thus, the family court's instructions to the jury, which complied with MCR 3.972(E) and the standard jury instructions, adequately and fairly presented the applicable law and protected respondents' due-process rights when they indicated that the possible verdicts were (1) that none of the grounds alleged in the petition had been proved or (2) that one or more of the statutory grounds alleged in the petition had been proved and that a verdict was reached when five jurors agreed on a verdict.

2. The family court did not violate respondents' right to due process when, after the close of proofs, it obtained the custody order from prior proceedings involving L. VanDalen in an effort to resolve a conflict in the testimony. The court gave the parties a meaningful opportunity to be heard, as required by due process, when it notified the parties of its actions, gave the parties an opportunity to review the previous order, and gave the parties an opportunity to present additional evidence and argument in light of the previous order.

3. The family court did not clearly err by finding that petitioner had established by clear and convincing evidence statutory grounds for termination in light of the evidence that both children, as infants, suffered unexplained, serious, nonaccidental injuries consistent with intentional abuse while in respondents' sole care and custody. The evidence demonstrated a pattern of abuse indicating a substantial risk of future harm to the children. Termination of parental rights under MCL 712A.19b(3)(g) and (j) is permissible even in the absence of determinative evidence regarding the identity of the perpetrator when the evidence shows that the respondents must have either caused the intentional injuries or failed to safeguard the children from injury. The evidence also clearly supported the trial court's finding that termination was in the children's best interests in light of the evidence that the children would not be safe in respondents' custody and the evidence that the children were thriving in the care of their foster parents.

Affirmed.

1. COURTS — JURISDICTION — CHILD PROTECTIVE PROCEEDINGS — DUE PROCESS — VERDICTS — JUROR CONSENSUS.

There is no requirement that the jurors reach a consensus regarding which specific statutory grounds alleged in a petition for jurisdiction in a child protective proceeding were proved; jurisdiction exists as long as five jurors find that the petitioner proved one or more statutory grounds for jurisdiction (MCR 3.972[E]).

2. PARENT AND CHILD — TERMINATION OF PARENTAL RIGHTS — STATUTORY GROUNDS — FAILURE TO PROVIDE PROPER CARE AND CUSTODY — REASONABLE LIKELIHOOD THAT CHILD WILL BE HARMED IF RETURNED TO PARENTS' HOME — ABSENCE OF DETERMINATIVE EVIDENCE REGARDING THE IDENTITY OF THE PERPETRATOR OF ABUSE.

Termination of parental rights under MCL 712A.19b(3)(g) and (j) is permissible even in the absence of determinative evidence regarding the identity of the perpetrator when the evidence shows that

the respondents must have either caused the child's intentional injuries or failed to safeguard the child from injury.

*Bill Schuette*, Attorney General, *John J. Bursch*, Solicitor General, *William P. Nichols*, Prosecuting Attorney, and *Michael C. Brown*, Assistant Prosecuting Attorney, for the Department of Human Services.

*Robert A. Manion* for the minor children.

*J. Henry Lievens* for G. VanDalen.

*Jeffery A. Yorkey* for D. Leader.

Before: FORT HOOD, P.J., and DONOFRIO and RONAYNE KRAUSE, JJ.

PER CURIAM. In these consolidated appeals, respondents appeal as of right the order terminating their parental rights to the minor children under MCL 712A.19b(3)(g) (failure to provide proper care and custody) and (j) (reasonable likelihood that the child will be harmed if returned to the parents' home). Because the trial court did not violate respondents' right to due process, the evidence clearly and convincingly established statutory grounds for the termination of respondents' parental rights, and the termination of respondents' parental rights was in the children's best interests, we affirm.

I

In early 2007, respondents had a child, L. VanDalen, the older child at issue. At the time of his birth, L. VanDalen's meconium tested positive for marijuana. Respondent-mother admitted that she had smoked marijuana when she was four months pregnant before she became aware of her pregnancy, after which she

.quit smoking it. Children's Protective Services (CPS) conducted an investigation but decided not to remove the child from respondents' care and services were provided to respondents, including substance abuse counseling and parenting services.

When L. VanDalen was only two weeks old, he was hospitalized after a nurse at his wellness checkup noticed oral lesions in his mouth. He also had an abrasion around his nostril. Medical personnel were concerned that the lesions may have been puncture marks in his throat. Dr. Leena Dev, a physician on the hospital's child protection team, evaluated L. VanDalen and opined that the lesions in his mouth could have been caused by trauma, possibly burns caused by hot formula from a baby bottle, or could have been herpes. There was not enough evidence to indicate intentional abuse. But a subsequent skeletal survey revealed that L. VanDalen had a fractured leg (tibia), which could have been caused by pulling the leg back and forth forcefully. Dr. Dev concluded that L. VanDalen's fracture, which was not related to birth trauma, "appeared to be an inflicted fracture consistent with child abuse[.]" Respondents, who were L. VanDalen's primary caretakers, did not know what caused his lesions or how he fractured his leg. According to respondent-mother, L. VanDalen had never been outside of respondents' sight after his birth and they "could only conjecture as to how [his] injuries occurred." Respondents believed that his fracture could have occurred when the technician drew blood from his ankle/heel area after his birth.

After L. VanDalen was diagnosed with a fractured leg consistent with abuse, petitioner, the Department of Human Services, filed a petition requesting the court to take temporary jurisdiction over him, and he was re-

moved from respondents' care and placed with Linda Golab, respondent-mother's stepmother. The court subsequently assumed jurisdiction over L. VanDalen. Respondent-mother described certain incidents to both the foster-care worker assigned to the case as well as Golab in which respondent-father would cover L. VanDalen's nose and mouth because he thought it was funny to see him squirm and pull on L. VanDalen's legs because he did not like how they bowed. While respondent-mother told the foster-care worker that she did not do anything about it because she thought respondent-father was "playing," she told Golab that she never trusted respondent-father alone with L. VanDalen and would even take him into the bathroom with her.

After L. VanDalen's removal, respondent-mother cooperated with regard to the services offered and did "anything" petitioner instructed her to do. Respondent-father, however, failed to cooperate or comply with regard to the services. The caseworker told respondent-mother that respondent-father's noncompliance with services would be problematic if they remained together, and her attorney and the caseworker advised her to distance herself from him.

By November or December 2007, respondents had ended their relationship. After respondents separated, respondent-mother expressed her desire that L. VanDalen not be left alone with respondent-father. At that time, respondent-mother, with assistance from Golab, had obtained employment as a nursing aide and had moved into rental housing, independent of respondent-father, that was located closer to L. VanDalen. According to Golab, respondent-mother was doing "fantastic," indicated she was "done" with respondent-father, was participating in services, and was moving on with her life.

In July 2008, approximately 16 months after L. VanDalen was removed from respondents' care, because of respondent-mother's compliance and progress with services L. VanDalen was placed in her home with intensive in-home family-reunification services in place. Respondent-mother indicated to the caseworker that she remained separated from respondent-father and they did not have a relationship and were planning for L. VanDalen separately. Afterward, respondent-father failed to participate in any services, maintain contact with the caseworker, visit L. VanDalen on a regular basis (only visiting a couple times in approximately six months), or obtain employment or stability.

In November 2008, pursuant to the caseworker's recommendation, the court dismissed its jurisdiction over L. VanDalen and put a custody order in place for respondent-father. At this time, the caseworker believed that respondent-mother would protect L. Van-Dalen from respondent-father and understood how to prevent physical abuse given her progress with services and her concern about respondent-father visiting L. VanDalen in an unsupervised setting. After the court closed the case, respondent-mother believed that she had primary physical custody over L. VanDalen, with visitation to be determined between respondents, but the caseworker believed that respondent-father was only allowed supervised visits with L. VanDalen, to be supervised by respondent-mother. It was never determined how L. VanDalen sustained his injuries.

Subsequently, the caseworker discovered that respondents had actually reunited and moved in together in October/November 2008 despite respondent-mother's awareness that the caseworker had discouraged her from being with respondent-father. Respondent-mother never indicated to the caseworker

that she had gotten back together with respondent-father, and the caseworker would not have recommended dismissal of the case if she had been aware that respondents had reunited. In March 2009, respondent-mother told Golab that respondent-father had changed, that he was excited about being a father, and that they were residing together and were very happy.

II

Around March 2009, respondent-mother became pregnant. During her pregnancy, in April 2009, respondent-mother tested positive for marijuana. Late in 2009, respondent-mother gave birth to D. VanDalen, the youngest child at issue. Respondents were D. VanDalen's primary caretakers. In April/May 2010, respondents and family members noticed that D. VanDalen, who had been developing normally, had regressed developmentally and was no longer progressing as expected. Specifically, they noticed that her toes were pointing downward, that she was not using her legs, and that she would not put any weight on her legs. Family members also noticed that D. VanDalen's eyes looked "dull," that she had a bump on her back, and that her left foot was swollen. Glenda Shultz, respondent-mother's 16-year-old half-sister, also noticed that D. VanDalen "just wasn't right" because she would cry and scream "like it hurt" when her diaper was changed.

On Friday June 11, 2010, respondent-mother and Glenda, who had arrived at respondents' home earlier in the month to help baby-sit the children over the summer while respondent-mother attended nursing school, left D. VanDalen with respondent-father to go to the library. When they returned, D. VanDalen was lying on the floor sleeping, "whimpering," and "whining,"

and would not wake up. Respondent-mother, who was a certified nursing assistant, thought D. VanDalen might have had a seizure and that she should take her to the hospital, but respondent-father, who believed D. Van-Dalen was acting normally and was not in any pain, said that respondent-mother was being a "hypochondriac," that D. VanDalen "was fine, and that respondent mother did not need to take her to the hospital." Respondent-mother and Glenda continued to try to wake D. VanDalen up by taking off her diaper, which usually awoke her, rubbing her back, rolling her over, talking to her, and taking her outside, but she did not wake up. At least 10 but up to 30 minutes later, D. VanDalen finally awoke but they could not get her to follow a finger visually. Glenda was upset and worried about D. VanDalen, but respondent-mother did not take D. VanDalen to the doctor.

Over the weekend, respondents noted that D. Van-Dalen, who was teething, was fussier than usual, irritable, sleeping more than usual, and not eating normally. Glenda also noted that D. VanDalen was crying and sleeping a lot more over the weekend, slept all day on Saturday, which was not normal, but acted "fine" on Sunday, June 13, 2010. Respondent-mother attributed D. VanDalen's increased sleepiness to teething.

On Sunday, respondent-father became angry when D. VanDalen spit up on his shirt while he was feeding her, went into a rampage, and started throwing stuff around while D. VanDalen lay on the floor. Glenda heard stuff being thrown around inside the house from her room. Respondent-mother told Glenda that, during respondent-father's rampage, L. VanDalen was scared and would not come out of his bedroom and that she should have put L. VanDalen in Glenda's room.

Respondent-father denied becoming angry when D. VanDalen spit up on him.

On Monday, June 14, 2010, respondent-mother went to school in the morning and left D. VanDalen with her grandmother (Helen Griffin) and Glenda. According to respondent-mother, D. VanDalen was awake, happy, and active in the morning. According to Griffin, D. VanDalen appeared happy, was talking and smiling in the morning, but by the afternoon she "did not look right" and had a "blank look" on her face. Griffin also noticed that D. VanDalen cried when Glenda changed her diaper and let out the "most excruciating cry" Griffin had ever heard when Glenda held her on her shoulder, which Griffin felt was not a "regular" cry. According to Glenda, D. VanDalen was whiny and sleepy on Monday. When respondent-mother returned home in the afternoon, Griffin told her that D. VanDalen did not look right, that there was something wrong with her, and that she was not herself. Respondent-mother agreed that D. VanDalen did not look right because her hand was out to the side and she had a "little stare," prompting respondent-mother to take her to the doctor immediately.

At the doctor's office, D. VanDalen started having ongoing, uncontrolled seizures, which were severe and would not stop on their own, and she had to be immediately taken to the hospital. At the hospital, Dr. Randall Schlievert, a physician board-certified in child abuse pediatrics, examined D. VanDalen and noticed two areas in her spine that were raised and movable, that her toes pointed downward persistently, and that she had low tone and "floppiness" in both arms and legs, which was indicative of a brain injury. Respondents indicated to Dr. Schlievert that there had been no accidental trauma to D. VanDalen.

Subsequent MRIs of D. VanDalen's brain revealed damage to her brain cells, examination of her eyes revealed retinal hemorrhaging and "some ridges where the retina had been pulled away from the underlying eye tissue." X-rays revealed numerous fractures of varying ages in her ribs, back, leg, and toes. Dr. Schlievert believed that a fracture on her left tibia and fibula could have been caused by repetitive pulling or yanking of her limbs. With regard to fractures in the toes of her left foot, Dr. Schlievert found these "pretty rare" and suggested that they could have been caused by forceful bending of her foot or if her foot was bent while she was shaken. According to Dr. Schlievert, the rib fractures on D. VanDalen's side, which showed swelling and signs of recent tissue injury and were at least 7 to 10 days old, differed in age from the rib fractures on her back, which were "maybe" several weeks old. The spinal fractures were difficult to date, but the advanced state of healing on the spinous processes indicated fractures that were several weeks to several months old, and the leg fractures were at least 7 to 10 days to several weeks old or older. Dr. Schlievert considered and ruled out possible medical causes for D. VanDalen's injuries, such as metabolic diseases, birth defects, infections, or bone diseases. He concluded that her brain injury, seizures, and numerous fractures were a result of shaken baby syndrome caused by more than one episode of "severe shaking," which could have been fatal. Dr. Schlievert could not recall a case with so many fractures and was "quite disturbed" when he saw the extent of D. VanDalen's injuries.[1]

Dr. Schlievert opined that, given the extent of her injuries, D. VanDalen was expected to have permanent

---

[1] Over the previous eight years, Dr. Schlievert had evaluated approximately 300 to 400 cases a year for potential child abuse.

brain damage resulting in motor problems, problems with the use of her arms or legs, or both, delayed walking, problems with decreased strength and tone, likely physical and cognitive delays or impairments, and possible vision damage. According to Dr. Schlievert, D. VanDalen's brain damage might have been mitigated had respondent-mother sought medical treatment when she first noticed that D. VanDalen was difficult to wake and appeared unconscious, and her failure to do so was neglectful because D. VanDalen's symptoms were possibly life threatening. Dr. Schlievert further opined that, without knowing who caused D. VanDalen's "repeated serious trauma," her caretakers should not be allowed access to the children.

III

After the extent and nature of D. VanDalen's injuries were revealed, L. VanDalen and D. VanDalen were removed from respondents' care pursuant to the petition requesting that the court take permanent custody over the children and terminate respondents' parental rights. The children were eventually placed with Golab. Respondents, who remained in a relationship and planned to marry by the time of the termination hearing in October 2010, denied ever hurting the children or doing anything harmful to them and never observed anyone else, including each other or family members, harming the children. Several family members who occasionally cared for D. VanDalen also testified that they never hurt the children or observed anyone hurt them. According to respondent-mother, she sought medical care for her children when she believed they needed it. Further, according to respondent-mother, she had never been afraid of respondent-father, he had never threatened or screamed at her, and she had never

seen him lose his temper in a manner that caused her concern about her children's welfare. The circumstances surrounding the children's injuries were never revealed, and petitioner never ascertained who injured the children.

After an adjudicatory trial, the jury found that a preponderance of the evidence established statutory grounds for jurisdiction under MCL 712A.2(b). Pursuant to the jury's verdict, the court assumed jurisdiction over the children and proceeded to determine at the initial dispositional hearing whether respondents' parental rights should be terminated. By October 2010, the foster-care worker opined that respondents' parental rights should be terminated and that termination would clearly be in the children's best interests. Pertinent to her opinion was the severity of D. VanDalen's injuries, the fact that this was the second time L. VanDalen had been removed from respondents' care because of abuse, the similarity of L. VanDalen's and D. VanDalen's unexplained fractures to their legs, and the fact that respondents were not always forthright.

After conducting a termination hearing, the court found that the evidence clearly and convincingly established grounds for termination under MCL 712A.19b(3)(g) and (j). The court then found that termination was clearly in the children's best interests under MCL 712A.19b(5) given the history of child abuse occurring while in respondents' care and proceeded to terminate respondents' parental rights. Respondents now appeal as of right.

IV

Respondents' first two claims on appeal allege violations of their right to procedural due process. We review de novo "[c]onstitutional questions and issues of statu-

tory interpretation, as well as family division procedure under the court rules . . . ." *In re AMAC*, 269 Mich App 533, 536; 711 NW2d 426 (2006); see also *In re CR*, 250 Mich App 185, 203; 646 NW2d 506 (2002). Procedural due process " 'limits actions by the government and requires it to institute safeguards in proceedings that affect those rights protected by due process, such as life, liberty, or property.' " *CR*, 250 Mich App at 204, quoting *In re AMB*, 248 Mich App 144, 209; 640 NW2d 262 (2001). " 'A procedural due process analysis requires a court to consider "(1) whether a liberty or property interest exists which the state has interfered with, and (2) whether the procedures attendant upon the deprivation were constitutionally sufficient." ' " *CR*, 250 Mich App at 204, quoting *AMB*, 248 Mich App at 209 (citation omitted). Generally, three factors will be considered to determine what is required by due process:

> "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." [*In re Brock*, 442 Mich 101, 111; 499 NW2d 752 (1993), quoting *Mathews v Eldridge*, 424 US 319, 335; 96 S Ct 893; 47 L Ed 2d 18 (1976); see also *In re MU*, 264 Mich App 270, 281; 690 NW2d 495 (2004).]

Respondents correctly contend that "parents have a due process liberty interest in caring for their children," *CR*, 250 Mich App at 204 (quotation marks and citation omitted), and that interest is at stake in child protective proceedings, see *Brock*, 442 Mich at 109-111. Further, the government's interest in protecting the welfare of children, which "coincides with the child's interest of

being free from an abusive environment," *MU*, 264 Mich App at 281, is significant here considering the severe abuse suffered by respondents' children while in their care. Given the competing interests at stake, "the pertinent question [is] whether the procedures used were constitutionally adequate." *CR*, 250 Mich App at 204, citing *AMB*, 248 Mich App at 209.

A

Respondents first allege that they were denied their right to due process during the adjudicatory trial when the court refused to deviate from the standard jury instructions that require a verdict that jurisdiction exists when five jurors agree that "one or more of the statutory grounds alleged in the petition have been proven" by a preponderance of the evidence.[2] MCR 3.972(E); see also M Civ JI 97.35; M Civ JI 97.49; M Civ JI 97.60. We review de novo claims of instructional error. *Lewis v LeGrow*, 258 Mich App 175, 211; 670 NW2d 675 (2003). "If, on balance, the theories of the parties and the applicable law are adequately and fairly presented to the jury, no error requiring reversal occurs." *Id.* Reversal is not warranted when the instructional error did not affect the outcome of the trial. *Jimkoski v Shupe*, 282 Mich App 1, 9; 763 NW2d 1 (2008).

Our review of the record reveals no error in the court's instructions, which complied with MCR 3.972(E) and the standard jury instructions. MCR

---

[2] "Ordinarily, an adjudication cannot be collaterally attacked following an order terminating parental rights." *In re SLH*, 277 Mich App 662, 668; 747 NW2d 547 (2008). However, when, as here, the termination occurs "at the initial disposition as a result of a request for termination contained in the original, or amended, petition for jurisdiction," a challenge to the adjudication "is direct and not collateral . . . ." *Id.*

3.972(E) plainly states that in child protective proceedings, " 'the verdict must be whether one or more of the statutory grounds alleged in the petition have been proven' " for the court to exercise its jurisdiction. *AMAC*, 269 Mich App at 536, quoting MCR 3.972(E). Accordingly, contrary to respondents' argument, there is no requirement that the jurors must reach a consensus regarding which specific statutory grounds supported jurisdiction. Instead, in accordance with MCR 3.972(E), jurisdiction exists as long as five jurors find that petitioner proved "one or more of the statutory grounds" for jurisdiction. MCR 3.972(E). Therefore, the trial court's instructions indicating that the possible verdicts were (1) that none of the statutory grounds alleged in the petition had been proved, or (2) that one or more of the statutory grounds alleged in the petition had been proved and that a verdict was reached when five jurors agreed on a verdict "adequately and fairly presented" the applicable law for the jury to find that jurisdiction existed. *Lewis*, 258 Mich App at 211.

Moreover, it was evident from the verdict form and the polling of the jury that all six jurors unanimously agreed that the court had jurisdiction over the children under all three statutory grounds asserted by petitioner and, thus, respondents could not have been prejudiced by the court's instructions as given. The verdict form submitted to the jury listed each individual statutory ground for jurisdiction asserted by petitioner with check boxes by each ground for the jury to indicate whether petitioner had proved or failed to prove each specific ground asserted. The jury found that "the court does have jurisdiction on all three . . . statutory grounds," and the jurors all indicated when polled by the court that that was, in fact, their verdict. The trial court's refusal to deviate from the standard instructions did not deprive respondents of their liberty inter-

est in the care and custody of their children. See also *Brock*, 442 Mich at 111, 114-115; *MU*, 264 Mich App at 281. The court's instructions did not prejudice respondents or deprive them of the fundamental fairness required by due process. See *CR*, 250 Mich App at 204.

B

Respondents next contend that they were denied their right to due process during the termination hearing when the court obtained evidence, on its own motion, after the close of evidence and without input from the parties. Respondents failed to object before the trial court and thus failed to properly preserve this issue for appellate review. *In re Hildebrant*, 216 Mich App 384, 389; 548 NW2d 715 (1996). We review unpreserved claims of constitutional error under a plain-error analysis. *People v Carines*, 460 Mich 750, 763-764, 774; 597 NW2d 130 (1999); *Kern v Blethen-Coluni*, 240 Mich App 333, 336; 612 NW2d 838 (2000). " 'To avoid forfeiture under the plain error rule, three requirements must be met: 1) the error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights.' " *Kern*, 240 Mich App at 336, quoting *Carines*, 460 Mich at 763.

L. VanDalen was initially removed from respondents' care as an infant and was made a temporary ward of the court as a result of his unexplained injuries which were consistent with abuse. Approximately 18 months later, pursuant to petitioner's recommendation, the court dismissed its jurisdiction over the child and the child was returned to respondent-mother's care after respondent-mother complied with participation in services and separated from respondent-father. The caseworker testified that she believed that the court allowed respondent-father only supervised visits with the child

with respondent-mother supervising the visits. Respondent-mother, however, testified that she believed that the court awarded her primary physical custody over the child and respondents were to agree on respondent-father's visits. Respondent-mother did not recall a requirement by the court that respondent-father's visits with the child be supervised. Thus, respondent-mother's and the caseworker's testimony conflicted regarding the terms of the custody arrangement and whether respondent-father's visits were required to be supervised.

After the conclusion of the termination hearing, the court, on its own motion, attempted to obtain the custody order from the court that had presided over the prior proceedings in an effort to resolve the conflict in the testimony. At the termination hearing, the court notified the parties that it had, in fact, sought out the custody order, but was unable to locate any information. The court then proceeded to hear closing arguments. Four days later, during the scheduled decision of the court, the court notified the parties that it had, in fact, obtained the pertinent custody order, which granted respondent-mother primary physical custody of the child with "reasonable visitation" for respondent-father and did not specify that the visits had to be supervised. The order, therefore, supported respondent-mother's testimony that she understood that there was no requirement that respondent-father's visits had to be supervised. The court further notified the parties that it had sought and obtained the transcript from the prior custody hearing, which indicated that petitioner was not comfortable with respondent-father's lack of compliance with his treatment plan and desired respondent-mother to supervise his visits with L. VanDalen. The transcript further indicated that the parties had agreed that respondent-mother would supervise the child's visits with respondent-father. The

transcript, therefore, supported the caseworker's testimony that she believed that respondent-father's visits were required to be supervised.

The trial court then gave the parties an opportunity to review both the order and the transcript and an opportunity to present additional evidence or argument in light of the newly obtained evidence. Respondents' attorney indicated that he wanted additional time to review the new information and that he would contact the court if he needed to do anything additional, and the court adjourned the proceedings. Two days later, the court admitted the order and transcript into evidence, without objection, and proceeded to render its decision. In its decision, the court noted the conflict between the transcript, which indicated that the parties agreed that respondent-father would have supervised visits only, and the actual court order, which did not specify a requirement that respondent-father's visits be supervised.

The trial court has authority to produce additional evidence when, as here, it obtained the evidence in an attempt to resolve a conflict in the testimony, which bore on respondent-mother's ability to adequately protect the children from harm or abuse, an issue pertinent to the termination decision. In child protective proceedings, under MCR 3.923(A),

[i]f at any time the court believes that the evidence has not been fully developed, it may:

(1) examine a witness,

(2) call a witness, or

(3) adjourn the matter before the court, and

* * *

(b) order production of other evidence.

We likewise conclude that the court's conduct did not deprive respondents of their right to due process. The record reveals that the court fully apprised the parties of its conduct in obtaining the additional evidence, allowed the parties to review the evidence, and gave the parties the opportunity to call additional witnesses and present additional evidence in light of the newly obtained evidence before rendering its decision. Respondents did not object to the court's actions or the admission of the newly obtained evidence, despite having the opportunity to do so. It is apparent, therefore, that the court gave respondents a meaningful opportunity to be heard, as required by due process. *Reed v Reed*, 265 Mich App 131, 159; 693 NW2d 825 (2005). Additionally, the newly obtained evidence did not contradict respondent-mother's testimony, and thus respondents could not have been unduly prejudiced by its admission. Under these circumstances, the court's conduct did not deprive respondents of their liberty interest in the custody and care of their children in a manner that violated their right to due process. See *Brock*, 442 Mich at 111; *MU*, 264 Mich App at 281. Likewise, respondents failed to demonstrate plain error that affected their substantial rights. See *Carines*, 460 Mich at 763-764; *Kern*, 240 Mich App at 336.

V

Respondents argue that petitioner failed to establish by clear and convincing evidence a statutory ground for termination. The trial court terminated their parental rights to the children under MCL 712A.19b(3)(g) and (j), which provide for termination under the following circumstances:

(g) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no

reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

\* \* \*

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

In order to terminate parental rights, the trial court must find by clear and convincing evidence that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been met. *In re Jackson*, 199 Mich App 22, 25; 501 NW2d 182 (1993). "If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). We review the trial court's determination for clear error. *In re Trejo Minors*, 462 Mich 341, 356-357; 612 NW2d 407 (2000); MCR 3.977(K).

The trial court did not clearly err by finding that the statutory grounds for termination were established by clear and convincing evidence. See *Trejo*, 462 Mich at 356-357; *Jackson*, 199 Mich App at 25. Both children, as infants, suffered unexplained, serious, nonaccidental injuries consistent with intentional abuse while in respondents' sole care and custody. Although the record contains no direct evidence implicating either respondent in the abuse, the extent and seriousness of the injuries to both children were consistent with prolonged abuse and clearly demonstrated a pattern of abuse in respondents' home indicating a substantial risk of future harm. This is especially so given the ongoing

uncertainty about the circumstances of the children's intentionally inflicted injuries.

Respondent-mother and respondent-father have consistently denied having any knowledge of the cause of their children's severe, nonaccidental injuries. We are dumbfounded by this bold claim. Again, in more than eight years of practice, consistently evaluating 300 to 400 cases a year, Dr. Schlievert could not recall a case with so many fractures and was "quite disturbed" when he saw the extent of D. VanDalen's injuries. Respondent-mother and respondent-father lived together in the same house with the children and shared responsibility for their care at the time the injuries occurred. Both noticed the children exhibiting different signs of distress related directly to their injuries. Surprisingly, other caregivers seemed to find the children's symptoms more alarming than respondents did. The facts are eminently clear in this case: Two infant children suffered severe, and in one case life-altering, injuries, at the hands of respondents because at least one of them perpetrated this shocking abuse and one of them failed to adequately safeguard the children from the abuse. Expert testimony established that there was absolutely no doubt that the injuries were not the result of accidents, they were not the result of birth trauma, and there were no other possible medical causes (either disease or defects) for the injuries. Respondents provided no plausible alternative explanation for the injuries that occurred in their home to their children, under their watch. Instead, they provided nothing more than far-fetched conjecture or silence. The evidence is uncontroverted that these injuries were the direct result of repeated, brutal abuse perpetrated by respondents. It does not matter in the least which of them committed these heinous acts.

On this record, we conclude that the evidence clearly and convincingly established a reasonable likelihood of harm or abuse if the children returned to respondents' home. MCL 712A.19b(3)(j). Likewise, the same evidence clearly and convincingly established that there was no reasonable expectation that respondents would be able to provide proper care and custody for the children within a reasonable time. MCL 712A.19b(3)(g). In sum, we hold that termination of parental rights under MCL 712A.19b(3)(j) and MCL 712A.19b(3)(g) is permissible even in the absence of determinative evidence regarding the identity of the perpetrator when the evidence shows that the respondents must have either caused the intentional injuries or failed to safeguard the children from injury.

VI

The evidence clearly supported the trial court's finding that termination was in the children's best interests. MCL 712A.19b(5). Compelling evidence indicated that the children would not be safe in respondents' custody considering that both children suffered unexplained injuries consistent with serious abuse while in respondents' primary care. L. VanDalen had been outside respondents' care almost half of his life because of the incidences of abuse. The children were young (L. VanDalen was 3½ years old and D. VanDalen was 10 months old at the time of the termination hearing), and the ongoing uncertainty about the circumstances surrounding the serious abuse of the children while in respondents' care weighed heavily against additional reunification efforts. The children had been placed in a stable home where they were thriving and progressing and that could provide them continued stability and permanency given the foster parents' desire to adopt them.

Given that the children's safety and well-being could not reasonably be assured in light of the past severe abuse of the children while in respondents' care, which remained unresolved, and that the children were thriving in the care of their foster parents, the court did not clearly err by finding that termination of respondents' parental rights was in the children's best interests. See *Trejo*, 462 Mich at 354, 356-357; MCL 712A.19b(5). The trial court did not err by terminating respondents' parental rights.

Affirmed.

FORT HOOD, P.J., and DONOFRIO and RONAYNE KRAUSE, JJ., concurred.