*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

*In re* S. J. SANBORN, Minor.

FOR PUBLICATION
May 13, 2021
9:05 a.m.

Nos. 354915 and 354916
Ionia Circuit Court
Family Division
LC No. 2019-000228-NA

Before: MURRAY, C.J., and MARKEY and LETICA, JJ.

PER CURIAM.

In these consolidated appeals,[1] respondents appeal as of right the trial court's order terminating their parental rights to the minor child under MCL 712A.19b(3)(c)(*ii*) (failure to rectify other conditions) and (j) (reasonable likelihood that child will be harmed if returned to parent). We affirm.

## I. MOTHER'S APPEAL

## A. REASONABLE EFFORTS

Mother first argues that the trial court erred by failing to order reasonable efforts before the initial termination hearing in 2019. We review for clear error a trial court's decision regarding reasonable efforts. *In re Fried*, 266 Mich App 535, 542-543; 702 NW2d 192 (2005). However, unpreserved issues are reviewed for "plain error affecting substantial rights." *In re Utrera*, 281 Mich App 1, 8; 761 NW2d 253 (2008). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) the error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *In re VanDalen*, 293 Mich App 120, 135; 809 NW2d 412 (2011) (quotation marks and citation omitted). "Generally, an error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings." *In re Utrera*, 281 Mich App at 9.

---

[1] *In re S J Sanborn Minor*, unpublished order of the Court of Appeals, entered September 29, 2020 (Docket Nos. 354915 and 354916).

Generally, "the [Department of Health and Human Services (DHHS)] has an affirmative duty to make reasonable efforts to reunify a family before seeking termination of parental rights." *In re Hicks/Brown*, 500 Mich 79, 85; 893 NW2d 637 (2017), citing MCL 712A.18f(3)(b) and (c) and MCL 712A.19a(2). "In general, when a child is removed from the parents' custody, the petitioner is required to make reasonable efforts to rectify the conditions that caused the child's removal by adopting a service plan." *In re Fried*, 266 Mich App at 542, citing MCL 712A.19f(1), (2), and (4). "[T]he Department must create a service plan outlining the steps that both it and the parent will take to rectify the issues that led to court involvement and to achieve reunification." *In re Hicks/Brown*, 500 Mich at 85-86. This general duty exists "to reunite the parent and children unless certain aggravating circumstances exist." *In re Moss*, 301 Mich App 76, 90-91; 836 NW2d 182 (2013). "Reasonable efforts to reunify the child and family must be made in all cases except those involving aggravated circumstances under MCL 712A.19a(2)." *In re Rippy*, 330 Mich App 350, 355; 948 NW2d 131 (2019), citing *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010).[2] Furthermore, MCL 712A.19a(2) provides in pertinent part:

> The court shall conduct a permanency planning hearing within 30 days after there is a judicial determination that reasonable efforts to reunite the child and family are not required. Reasonable efforts to reunify the child and family must be made in all cases except if any of the following apply:
>
> * * *
>
> (c) The parent has had rights to the child's siblings involuntarily terminated and the parent has failed to rectify the conditions that led to that termination of parental rights.

The DHHS's initial petition sought removal of the child from mother's care, but the petition did not seek termination. On the basis of the allegations contained in the initial petition, the trial court ordered removal of the child from mother's care. Mother does not contest that removal. However, the trial court did not authorize the initial petition at the first May 2019 hearing because it wanted to wait until respondents had appointed counsel. Consequently, the trial court ordered reasonable efforts to reunify the family at that hearing. It was not until after the first hearing that the DHHS filed its first amended petition seeking termination. The termination petition contained allegations that parental rights were terminated to one or more siblings of the child "due to serious and chronic neglect or physical abuse, and the parent has failed to rectify the conditions that led to the prior termination of parental rights." Thereafter, the trial court took testimony at the second

---

[2] To the extent our Court had previously stated that the DHHS "is not required to provide reunification services when termination of parental rights is the agency's goal," *In re HRC*, 286 Mich App 444, 463; 781 NW2d 105 (2009), that statement was dicta because aggravated circumstances were present in that case, and has been implicitly clarified by *In re Rippy*, and is contrary to *In re Rood*, 483 Mich 73, 99-100; 763 NW2d 587 (2009) (opinion by CORRIGAN, J.) and *In re Hicks/Brown*, 500 Mich at 85. As Judge Beckering explained in her dissenting opinion, the general statement from *In re HRC* was taken out of context, and is inconsistent with prior and subsequent binding law, a point the *In re Rippy* majority did not dispute. See *In re Rippy*, 330 Mich App at 369 n 5 (BECKERING, J., dissenting).

May 2019 hearing and concluded that probable cause existed that one or more of the allegations contained in the termination petition were true. It further concluded that reasonable efforts to reunify the family were not required because of the previous termination and respondents' apparent failure to rectify the conditions that led to that termination.

Reasonable efforts are likewise not required when a parent has his or her parental rights involuntarily terminated to a sibling of the child at issue, and the parent failed to rectify the conditions that led to that earlier termination of parental rights. See MCL 712A.19a(2)(c). Mother's argument in this regard essentially focuses on the fact that the trial court later determined that there was not clear and convincing evidence to terminate respondents' parental rights after the trial court heard testimony during the June 2019 termination hearing. However, the evidence presented up to the June 2019 hearing established by a preponderance of the evidence that mother's parental rights were terminated to the child's sibling, and mother failed to rectify the conditions that led to that termination. Under a less strenuous burden of proof, the trial court did not err by denying reasonable efforts at the outset. Then, when the burden of proof became clear and convincing evidence to terminate parental rights, the trial court concluded that there was not clear and convincing evidence and ordered reasonable efforts.

Stated differently, the trial court operated with the evidence available to it at the time it made its initial reasonable efforts finding. The DHHS alleged in its first amended petition, under MCL 712A.19b(3)(i), that mother's parental rights to the other child were terminated because of serious and chronic neglect, or physical or sexual abuse, and mother failed to rectify those conditions that led to that termination. Following the steps outlined in MCR 3.977(E), the trial court (1) concluded that an amended petition contained a request for termination, and (2) found by a preponderance of the evidence that one or more of the grounds for assumption of jurisdiction over the child had been established. The evidence introduced to the trial court at the time of the first three hearings established by a preponderance of the evidence that mother's parental rights were involuntarily terminated with respect to a sibling of the child, and the conditions that existed to warrant that termination still existed. "Pursuant to MCL 712A.19a(2)(c), the prior involuntary termination of parental rights to a child's sibling is a circumstance under which reasonable efforts to reunite the child and family need not be made." *In re Smith*, 291 Mich App 621, 623; 805 NW2d 234 (2011).

As the case progressed to the initial termination hearing, the burden of proof rose from a preponderance of the evidence to clear and convincing evidence. See MCR 3.977(E)(2) and (3). It was at the June 2019 hearing that the trial court determined that the DHHS had not met its burden to prove by clear and convincing evidence that a statutory ground for termination existed under MCL 712A.19b(3)(i). In other words, the trial court concluded that there was not sufficient evidence to prove by *clear and convincing* evidence that mother's parental rights were terminated to the other child on the basis of serious and chronic neglect or physical or sexual abuse. Consequently, there was no longer a basis to deny reasonable efforts under MCL 712A.19a(2)(c) because there was no evidence presented to establish by clear and convincing evidence the existence of a statutory ground under MCL 712A.19b(3)(i).

The trial court cannot be faulted for making its initial finding on the basis of a less stringent burden of proof. The DHHS's subsequent failure to prove by clear and convincing evidence a statutory ground for termination does not invalidate the trial court's initial determination or

otherwise make that initial determination erroneous. After the trial court concluded that the DHHS failed to meet its burden, the trial court ordered the DHHS to initiate a case service plan and offer reasonable efforts to reunify the family. Accordingly, the trial court did not commit clear error, and mother has failed to establish any plain error affecting her substantial rights. See *In re Utrera*, 281 Mich App at 9; *In re BZ*, 264 Mich App 286, 296-297; 690 NW2d 505 (2004).

Mother next challenges the trial court's findings that reasonable efforts were made after the July 2019 initial termination hearing leading up to the August 2020 termination hearing. Her challenge in this regard is two-fold: (1) that the DHHS did not offer reasonable efforts to accommodate her intellectual disabilities under the American with Disabilities Act (ADA), 42 USC 12101 *et seq.*, and (2) notwithstanding the lack of accommodations under the ADA, the reasonable efforts were not sufficient. We review unpreserved claims for plain error affecting substantial rights. See *In re Utrera*, 281 Mich App at 9.[3]

In addition to the DHHS's affirmative duty to make reasonable efforts to reunify a family before seeking termination of parental rights, *In re Hicks/Brown*, 500 Mich at 85-86, the DHHS also has "obligations under the ADA that dovetail with its obligations under the Probate Code," *id*. at 86. The DHHS "must make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless . . . the modifications would fundamentally alter . . . the service provided." *Id*. (quotations marks and citation omitted; ellipses in original). This includes a parent with "*a known or suspected intellectual, cognitive, or developmental impairment.*" *In re Hicks/Brown*, 315 Mich App 251, 282; 890 NW2d 696 (2016), aff'd in part and vacated in part 500 Mich 79 (2017).

Absent reasonable modifications, "efforts at reunification cannot be reasonable under the Probate Code if the [DHHS] has failed to modify its standard procedures in ways that are reasonably necessary to accommodate a disability under the ADA." *In re Hicks/Brown*, 500 Mich at 86. When challenging the services offered, a respondent must establish that he or she would have fared better if other services had been offered. See *In re Fried*, 266 Mich App at 542-543.

When the trial court ordered reasonable efforts, the DHHS offered several services, including foster-care case management, Right Door case management (which included individual therapy, medication management, and case management), infant-mental health referrals, supportive visitation referrals, housing assistance, individual therapy, gas cards, and supervised parenting time with the child. As the case progressed, the DHHS offered psychological evaluation referrals for respondents, services for feeding therapy, physical therapy, transportation assistance, and Positive Solutions, Informed Choices (PSIC) referral for parenting skills and techniques. Respondents were also offered parenting packets.

---

[3] Mother did not assert "that the services provided [were] inadequate to her particular needs . . . ." *In re Terry*, 240 Mich App 14, 26; 610 NW2d 563 (2000). In *In re Terry*, we held that "[a]ny claim that the parent's rights under the ADA were violated must be raised well before a dispositional hearing regarding whether to terminate her parental rights, and the failure to timely raise the issue constitutes a waiver." *Id*. at n 5. We address the merits of mother's claim nonetheless.

-4-

Mother underwent her psychological evaluation in March 2020, which identified that mother needed comprehensive IQ testing to fully establish her intellectual disability, which, if mother met the criteria for intellectually disabled, "could potentially open up more opportunities for social service intervention and would also greatly assist the caseworkers in designing the family services intervention." Dr. Jeffrey Kieliszewski also recommended a "comprehensive parenting education class" to "accommodate her intellectual deficits and reading difficulties." According to the record, the DHHS caseworkers were aware of mother's intellectual disabilities from the previous termination. Despite this knowledge and Dr. Kieliszewski's recommendations, the DHHS decided to change the goal from reunification to termination. This was because, around approximately the time that mother received her psychological evaluation, mother had stopped discussing her progress with the DHHS caseworker. The DHHS caseworker testified that there were several occasions that mother refused to work with her. Before Dr. Kieliszewski conducted the psychological evaluation, the DHHS offered numerous services, even services that were designed to provide mother "repeated exposure," something that Dr. Kieliszewski testified was appropriate for someone with an intellectual disability to receive. For example, the DHHS hired a private nursing agency to teach mother how to properly feed the child after doctors had already shown her the feeding techniques during medical appointments. The DHHS offered this because mother struggled to grasp how to properly feed the child given his medical condition. Therefore, the DHHS inadvertently offered mother repeated exposure on how to properly feed the child, but she was still unable to appropriately feed the child.

Notably, mother's entire argument merely provides conclusory statements about the services that were offered and how those services were not appropriate given her intellectual disability. However, mother does not provide any substantive argument on how those services were deficient or how they were not reasonable or appropriate in light of her intellectual disability. Mother also does not identify any service that she believes would have benefited her more than the services that were actually provided. Mother merely lists the results of the psychological evaluation and the recommendations of Dr. Kieliszewski to essentially argue that the services offered by the DHHS were insufficient. But, when challenging the services offered, mother must establish that she would have fared better if other services had been offered. See *In re Fried*, 266 Mich App at 542-543. Without an identification of services to accommodate mother's intellectual disability, we are left to speculate what other services the DHHS *could* have offered.

Unlike *In re Hicks/Brown*, the record does not establish that there were specific services that the DHHS failed to provide. Instead, mother has failed to identify what services the DHHS should have provided to accommodate her specific needs. See *id*. Even considering Dr. Kieliszewski's recommendations, which came approximately at the time that mother failed to report to the DHHS caseworker, mother has not shown that the services offered by the DHHS did not comport with the recommendation, i.e., that mother receive comprehensive parenting education classes and more social service intervention. Mother received numerous referrals for parenting classes through PSIC, which would have provided "repeated exposure" to the parenting lessons.[4] She also had a breadth of other services, including foster-care case management, Right

---

[4] Mother asserts that she needed "hands-on instruction" and that the PSIC classes "consisted only of online videos." However, she neglects to mention that the DHHS caseworker testified that PSIC

Door case management (which included individual therapy, medication management, and case management), infant-mental health referrals, supportive visitation referrals, housing assistance, individual therapy, gas cards, and supervised parenting time with the child before the pandemic. Mother's blanket denial that the services offered were insufficient in light of her intellectual disability, without identifying any services that would have been appropriate in light of such disability or how the services that were offered were deficient, and does not establish plain error affecting substantial rights. *In re Utrera*, 281 Mich App at 9.

Furthermore, mother faults the DHHS for failing to facilitate the development of a bond between her and the child. However, the record indicates that mother had several supervised parenting visits with the child beginning in July 2019. These supervised parenting visits continued up until March 2020 when the parents volunteered to stop in-person visits for the sake of the child's health because of COVID-19 related concerns. The DHHS then provided photos and videos of the child, as well as set up virtual meetings to engage with the child over the Zoom video platform. However, the record indicates that mother struggled with video conferencing technology. The DHHS caseworker also recommended that mother create videos and take pictures to send to the child. Instead, there were threats made to the foster parents, and respondents refused to film themselves for the child because respondents believed that the foster parents would take their fun ideas and use them for themselves. Mother cannot fault the DHHS for refusing to engage in recommendations that the DHHS believed would help foster a bond with the child. Given the circumstances of the pandemic and the child's health issues, video conferencing, photos, and videos were the only realistic way to continue forming a bond with the child, albeit not the best way. Still, mother's refusal to engage in those activities for the first couple months of the pandemic does not amount to a failure by the DHHS to facilitate the development of a bond.

We conclude that the trial court did not err by finding that the DHHS made reasonable efforts to reunify the family.

## B. UNTIMELY HEARINGS

Next, mother argues that the trial court violated her due-process rights by not scheduling timely hearings. "Generally, whether child protective proceedings complied with a respondent's substantive and procedural due process rights is a question of law that this Court reviews de novo." *In re TK*, 306 Mich App 698, 703; 859 NW2d 208 (2014). However, an "unpreserved claim of constitutional error is reviewed for plain error affecting substantial rights." *In re Williams*, 286 Mich App 253, 274; 779 NW2d 286 (2009).

"The fundamental requisite of due process of law is the opportunity to be heard. The hearing must be at a meaningful time and in a meaningful manner." *In re Rood*, 483 Mich 73, 92; 763 NW2d 587 (2009) (quotation marks and citations omitted). "Due process requires fundamental fairness, which is determined in a particular situation first by considering any relevant precedents and then by assessing the several interests that are at stake." *Id*. (quotation marks and

---

was "trying to recommend different services for them that the parents refused to comply with." The DHHS caseworker also testified that the repeated exposure to the videos would have "been incredibly beneficial for" mother considering her cognitive abilities.

citations omitted). "In Michigan, procedures to ensure due process to a parent facing removal of his child from the home or termination of his parental rights are set forth by statute, court rule, DH[H]S policies and procedures, and various federal laws . . . ." *Id*. at 93. "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *In re Brock*, 442 Mich 101, 111; 499 NW2d 752 (1993) (quotation marks and citation omitted; alteration in original).

Relevant to this case are the procedures outlined in MCL 712A.19a(2) and MCL 712A.19(3). MCL 712A.19a(2) provides in relevant part:

> The court shall conduct a permanency planning hearing within 30 days after there is a judicial determination that reasonable efforts to reunite the child and family are not required.

MCL 712A.19(3) provides in relevant part:

> Except as otherwise provided in subsection (4), if, in a proceeding under section 2(b) of this chapter, a child is subject to the court's jurisdiction and removed from his or her home, a review hearing must be held not more than 182 days after the child's removal from his or her home and no later than every 91 days after that for the first year that the child is subject to the court's jurisdiction. After the first year that the child has been removed from his or her home and is subject to the court's jurisdiction, a review hearing must be held not more than 182 days from the immediately preceding review hearing before the end of that first year and no later than every 182 days from each preceding review hearing after that until the case is dismissed. A review hearing under this subsection must not be canceled or delayed beyond the number of days required in this subsection, regardless of whether a petition to terminate parental rights or another matter is pending. [(Footnote omitted).]

Here, even assuming the trial court held hearings outside the applicable 30-day and 91-day windows of MCL 712A.19a(2) and MCL 712A.19(3), we conclude that any delay was harmless. First, it is worth noting that the delay between the January 2020 hearing and the May 2020 hearing was at no fault of the trial court. At the time of the January 2020 hearing, the trial court scheduled the next hearing for April 2020, but the COVID-19 pandemic struck Michigan in March 2020. As a result, Governor Gretchen Whitmer issued several executive orders, and the Michigan Supreme Court issued several administrative orders, that severely limited hearings conducted at the trial court level. See Executive Order No. 2020-21 and Administrative Order No. 2020-1, ___ Mich ___ (2020). As the trial court mentioned, it conducted the May 2020 hearing via Zoom. Therefore, any delay between the January 2020 hearing and the May 2020 hearing can be attributed to the unprecedented COVID-19 pandemic and not to the trial court.

With respect to the delay under MCL 712A.19a(2), MCR 2.613(A) provides that

> . . . an error in a ruling or order, or an error or defect in anything done or omitted by the court or by the parties is not ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order,

unless refusal to take this action appears to the court inconsistent with substantial justice.

We have stated that "a trial court's error in issuing a ruling or order *or an error in the proceedings* is not grounds for this Court to reverse or otherwise disturb an order unless this Court believes that failure to do so would be inconsistent with substantial justice." *In re TC*, 251 Mich App 368, 371; 650 NW2d 698 (2002) (emphasis added). We conclude that mother's subsequent receipt of services after the trial court's denial to terminate her parental rights during the July 2019 hearing essentially cured any due process violation that arose from the delay between the preliminary hearing and the termination/disposition hearing. "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *In re Brock*, 442 Mich at 111 (quotation marks and citation omitted; alteration in original). The trial court afforded mother these protections by declining to terminate her parental rights during the July 2019 hearing and subsequently ordering reasonable efforts.

Because of mother's subsequent receipt of services, there was no fundamental unfairness. Mother seemingly argues that she could have received an extra month of services had the permanency planning hearing occurred within the 30-day limit. Considering mother's previous involvement in services with respect to her other child, and the subsequent termination of her parental rights to that child, it was not fundamentally unfair that mother did not receive an extra month of services with respect to this child. Furthermore, although evidence established that mother participated in the services offered by the DHHS, there was little to no evidence presented that she benefited from those services, *and* testimony demonstrated that mother refused to work with the DHHS caseworker despite her engagement in services, meaning the DHHS caseworker was unable to get an update on the benefits, if any, the services were having. Accordingly, upholding the trial court's termination order despite mother's argument that she could have received an additional month of services is consistent with substantial justice. See MCR 2.613(A).

Mother also raises an issue with the DHHS's delay in filing the termination petition after the May 2020 hearing. The trial court ordered the DHHS to initiate termination proceedings "no later than 28 days from the date of this hearing." It was not until July 2020, that the DHHS filed its petition requesting termination, which was clearly outside the 28-day time frame that the trial court ordered. MCL 712A.19a(8) authorizes the trial court to order termination proceedings in its discretion:

> If the court determines at a permanency planning hearing that a child should not be returned to his or her parent, the court may order the agency to initiate proceedings to terminate parental rights . . . .

Although the DHHS filed its petition outside of the 28-day limit imposed by the trial court, this two-month delay provided mother further opportunity to engage in services that would have otherwise been halted two months previously had the DHHS filed its petition within the 28-day limit. In other words, the DHHS's delay in filing a termination petition actually provided *more* opportunity to mother to engage in services, benefit from services, and continue supervised parenting visits (albeit virtual) that she would have otherwise lost out on had the petition been timely filed because services and supervised parenting time continued during the time between the May 2020 hearing and the filing of the July 2020 termination petition. Accordingly, the DHHS's

delay was *not* inconsistent with substantial justice. See MCR 2.613(A); *In re TC*, 251 Mich App at 371.

## C. STATUTORY GROUNDS

Mother also asserts that the trial court erred by finding that a statutory ground existed to terminate her parental rights under MCL 712A.19b(3)(c)(*ii*) or (j). "In order to terminate parental rights, the trial court must find by clear and convincing evidence that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been met." *In re VanDalen*, 293 Mich App at 139. We review the trial court's determination of statutory grounds for clear error. *Id*. "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re BZ*, 264 Mich App at 296-297. "Appellate courts are obliged to defer to a trial court's factual findings at termination proceedings if those findings do not constitute clear error." *In re Rood*, 483 Mich at 90. If the trial court did not clearly err by finding one statutory ground existed, then that one ground is sufficient to affirm the termination of respondent's parental rights. See *In re HRC*, 286 Mich App 444, 461; 781 NW2d 105 (2009).

Grounds for termination exist under MCL 712A.19b(3)(c)(*ii*) "if 182 or more days have elapsed since the issuance of an initial dispositional order" and

> (1) the parent is the respondent in a child-neglect proceeding, (2) other conditions exist that cause the child to come within the court's jurisdiction, (3) the parent received recommendations to rectify those conditions and had a reasonable opportunity to do so and the respondent failed to rectify the other conditions, and (4) there is no reasonable likelihood she will do so within a reasonable time given the age of the child. [*In re JK*, 468 Mich 202, 211; 661 NW2d 216 (2003).]

Here, the first dispositional order was the trial court's July 2019 order denying the DHHS's initial request for termination on the basis of MCL 712A.19b(3)(i). Subsequently, mother's parental rights were terminated in August 2020. Therefore, consistent with MCL 712A.19b(3)(c), more than 182 days had passed since the initial dispositional order.

With respect to other conditions existing, it became evident that mother lacked the requisite parenting skills and emotional stability to care for the child whom had several medical conditions that required particular care. As adjudication over mother was exercised on the basis of her plea, during which she admitted that she was homeless and that her homelessness affected her ability to care for the child, the other conditions that arose during the pendency of the case were unrelated to the grounds that led to the initial adjudication. Furthermore, the DHHS offered mother services to rectify those conditions, i.e., her parenting skills and emotional stability; mother had a reasonable opportunity to rectify those conditions, and she failed to rectify those conditions.

Although mother participated in all the services that the DHHS offered, mere participation is not the same as overcoming the barriers in place. See *In re TK*, 306 Mich App at 711. Mother also stopped communicating with the DHHS caseworker, which was one of the reasons that the DHHS moved from reunification to termination. Evidence established that, although mother participated in the services, there was no way to determine whether she actually benefited from

those services because she stopped informing the DHHS caseworker about her progress. There was also testimony that mother was paranoid, suspicious, and distrusting of the service providers aside from her therapist, and that mother was afraid to be left alone with the child. Further, although mother admitted that she took Zoloft to treat her depression, there was evidence presented that father at one point forbade her from taking the medication.

Regarding whether there was a reasonable likelihood to rectify the conditions given the child's age, mother asserts that she should have been given "more time to continue to progress given that she had clearly shown that she was willing to do so to the best of her abilities and that she was making progress." Yet, this neglects that "there is no reasonable likelihood she will do so *within a reasonable time given the age of the child*." *In re JK*, 468 Mich at 211 (emphasis added). The DHHS took custody of the child only two days after the child's birth, and the case then proceeded for the next 15 months, during which mother received services for approximately 12 months. Even before the pandemic, mother received eight months of services and supervised in-person parenting visits with the child. Still, during those eight months, evidence established that, although mother was appropriate with the child during the in-person visits, she did not understand the child's development and was unsuccessful at feeding him. This was despite mother receiving extra training from a nursing agency that the DHHS hired to train mother on how to properly feed the child given his medical needs. Dr. Kieliszewski also testified that he recommended long-term and intensive parenting services if reunification occurred, which was already on top of the 15 months that the child was in the DHHS's care, and he did not identify how long those services would be needed. As the trial court concluded, "[I]t just does not seem likely that these issues will be rectified within a reasonable time considering the age of the child." Mother repeatedly directs us to her consistent participation in services, but she fails to realize that she must "demonstrate that [she] sufficiently benefited from the services provided," of which there was insufficient evidence. *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012).[5]

## D. BEST INTERESTS

Lastly, mother challenges the trial court's findings with regard to whether termination was in the child's best interests. We review the trial court's determination of best interests for clear error. *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re BZ*, 264 Mich App at 296-297. "Appellate courts are obliged to defer to a trial court's factual findings at termination proceedings if those findings do not constitute clear error." *In re Rood*, 483 Mich at 90.

"Even if the trial court finds that the [DHHS] has established a ground for termination by clear and convincing evidence, it cannot terminate the parent's parental rights unless it also finds by a preponderance of the evidence that termination is in the best interests of the children." *In re Gonzalez/Martinez*, 310 Mich App 426, 434; 871 NW2d 868 (2015). The trial court was required

---

[5] Because we conclude that the trial court did not clearly err in respect to this statutory ground, we need not address the statutory ground under MCL 712A.19b(3)(j). See *In re HRC*, 286 Mich App at 461.

to find by a preponderance of the evidence that termination of parental rights was in the child's best interests. See *In re Olive/Metts*, 297 Mich App at 40. "In making its best-interest determination, the trial court may consider the whole record, including evidence introduced by any party." *In re Medina*, 317 Mich App 219, 237; 894 NW2d 653 (2016) (quotation marks and citation omitted). "[T]he child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home, are all factors for the court to consider when deciding whether termination is in the best interests of the child." *In re Gonzalez/Martinez*, 310 Mich App at 434 (quotation marks and citation omitted). The trial court may also consider the child's age, inappropriate parenting techniques, and continued involvement in domestic violence. See *In re Jones*, 286 Mich App 126, 131; 777 NW2d 728 (2009). It may further consider visitation history, the parent's engaging in questionable relationships, the parent's compliance with treatment plans, the child's well-being in care, and the possibility of adoption. See *In re BZ*, 264 Mich App at 301; *In re AH*, 245 Mich App 77, 89; 627 NW2d 33 (2001).

A preponderance of the evidence supported a finding that termination of mother's parental rights was in the child's best interests. The trial court noted that mother received services in regard to her other child before her parental rights to that child were terminated in 2018. But, some of the issues that existed with respect to the other child carried over to the child in this case, such as mother's lack of insight or knowledge about child development, child care practices, and parenting techniques. The trial court indicated that it was not holding parenting techniques against mother because of the COVID-19 pandemic essentially canceling in-person visits with the child. The trial court further indicated that it was not holding the lack of bond between the child and mother against mother because of the COVID-19 pandemic.

However, although there was evidence that mother complied with the case service plan, there was no evidence that mother sufficiently benefited, if at all, from the services. Mother could not recall what she learned from the parenting classes, she was unable to talk about how she would teach the child to roll over, and she was unable to provide any examples of how to parent a young child that she learned from her therapist. Further, mother testified that she would throw a ball to play catch with the child when the child was not even a year old, providing more evidence that mother lacked the requisite knowledge of child development. Mother was also unable to successfully feed the child when in-person visits were offered despite repeated exposure to feeding therapy and a private lesson.[6] The trial court also concluded that the child's need for permanency, considering how long the child was in foster care and how long the child might have to wait for

---

[6] Mother asserts that she was unable to establish any benefit from the services because of the cessation of services as a result of the pandemic. But mother fails to demonstrate why the pandemic precluded her from doing so. Moreover, mother provides no explanation for why she could not establish any benefit from services during the first eight months of this case, which was before the pandemic. Simply looking at the evidence up to the "shutdown," there was only testimony that mother *complied* with the services and attended all of her parenting visits. In other words, mother was an ideal parent in terms of compliance with the case service plan, but this was not a case focused on mother's noncompliance; rather, it was mother's failure to establish *benefit* from her compliance that the trial court focused on. *In re TK*, 306 Mich App at 711.

-11-

mother to rectify the conditions that still existed, was a heavy factor in favor of termination. Dr. Kieliszewski testified that he recommended long-term, intensive intervention services if reunification were to occur, but he did not indicate how long those services would be required. This was also on top of the 15 months that the child was already in foster care. Accordingly, there was a preponderance of evidence to establish that termination of mother's parental rights was in the child's best interests, and we are not left with a definite and firm conviction that a mistake was made. See *In re Olive/Metts*, 297 Mich App at 40; *In re BZ*, 264 Mich App at 296-297.

## II. FATHER'S APPEAL

Father's only argument on appeal is that the trial court erred by finding that a statutory ground existed to terminate his parental rights. We review the trial court's determination of statutory grounds for clear error. See *In re VanDalen*, 293 Mich App at 139.

Termination under MCL 712A.19b(3)(j) is appropriate when "[t]here is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent." The harm contemplated under MCL 712A.19b(3)(j) includes emotional harm as well as physical harm. See *In re Hudson*, 294 Mich App 261, 268; 817 NW2d 115 (2011). Sufficient evidence supported the trial court's decision to terminate father's parental rights under this statutory ground. There was evidence that, although father participated in the services offered by the DHHS, there was a failure to communicate with the service providers, which led the DHHS to believe that father had not benefited from the services because father provided no insight into any benefit that he may have received.

> The record establishes that respondent was provided with a multitude of intensive services. Although respondent had cooperated, [he] had made little progress. [He] lacked insight into the needs of [his] children and had not internalized what [he] had been taught. Not only must respondent cooperate and participate in the services, [he] must benefit from them. [*In re TK*, 306 Mich App at 711 (concluding in the context of reasonable efforts).]

Father's own testimony established that he was unable to recall anything that he learned from the parenting classes and that he needed further assistance with respect to the child's medical needs. He also could not recall any of the knowledge that he gained throughout the duration of this case to help care for the child. Therefore, father's lack of insight or knowledge on how to properly parent the child causes a reasonable likelihood that the child would be harmed if returned to father's care. See MCL 712A.19b(3)(j). Even father admitted that he was not ready to have the child return home despite the services he received leading up to the termination hearing. Accordingly, we are not left with a definite and firm conviction that a mistake was made by

terminating father's parental rights under this statutory ground.  See *In re BZ*, 264 Mich App at 296-297.[7]

       Affirmed.


                          /s/ Christopher M. Murray
                          /s/ Jane E. Markey
                          /s/ Anica Letica

---

[7] Because we conclude that termination under this statutory ground was supported by the evidence, we need not address the other statutory ground supporting the termination order.  *In re HRC*, 286 Mich App at 461.