*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

*In re* M. M. L. Dixon, Minor.

UNPUBLISHED
August 18, 2022

No. 358282
Wayne Circuit Court
Family Division
LC No. 2019-001161-NA

Before: SAWYER, P.J., and SHAPIRO and REDFORD, JJ.

PER CURIAM.

Respondent mother appeals from an order of the circuit court terminating her parental rights to the minor child. We affirm.

Trial in this case was held on July 29, 2021, before a Family Division referee. The first witness was Chelsea Scherz, a Foster Care Worker with Orchards Children's Services. She was assigned to this case from May 28, 2020, through January 11, 2021. (Tr 7/29/2021, p 7.) A treatment plan was established, which requirements included obtaining and maintaining housing and a legal source of income, to remain in contact with the foster care worker, to participate in parent visitation, to attend and benefit from parenting classes, to participate in infant mental health services, and to participate in individual therapy. (*Id.* at 9.) She was also ordered to complete a psychiatric assessment, to participate in a parent partner program, and to remain in compliance with the sex offender registry. (*Id.*)

According to Scherz, respondent was referred to parenting classes at least nine times, but never completed any. (*Id.* at 10.) As for housing, Scherz stated that respondent was renting a room, but that she had received an eviction notice. (*Id.*) But respondent stated that she did not feel safe in that housing as people came into her room and stole things; it was not a safe environment for the minor child. (*Id.*) Although services were offered to assist respondent in finding suitable housing, she did not fully take advantage of those services. (*Id.* at 13-14.) Respondent did at one point indicate that she was going to move in with an uncle, but refused to allow a home assessment of the uncle's property. (*Id.* at 16.)

As for the parent partner program, respondent received six referrals and was assigned two different parent partners. (*Id.* at 17.) The services with the first parent partner ended because respondent refused to work with that partner and she never worked with the second partner as she

-1-

refused to initiate the services and those services were terminated. (*Id.* at 17-18.) After that, the agency was reluctant to assign a new parent partner because of respondent's behavior. (*Id.* at 18.)

Respondent did complete a psychological assessment, which led to a referral for a psychiatric assessment. (*Id.* at 18-19.) Respondent did start receiving psychiatric services; but after a referral to a new psychiatrist was ordered, respondent did not start seeing the new psychiatrist. (*Id.* at 19.) At every parenting time visit, the workers offered to assist respondent in scheduling an intake for new psychiatric services, but she did not take advantage of that assistance. (*Id*. at 20.) With respect to individual therapy, she received three referrals. The first two ended because respondent refused to participate with those therapists. Respondent self-referred to East Seals and had been participating in individual therapy through them, but has not demonstrated that she has benefited from the services. (*Id*. at 21-22)

Scherz further testified that respondent's communication with the assigned foster care specialists was inconsistent. (*Id.* at 22.) At times she was willing to communicate with them, which at other times she would refuse to speak with them or make herself available. (*Id.*) Scherz also related that the worker previous to her had been removed from the case because respondent continued to send her threatening text messages and called her racial slurs. (*Id.*)

With respect to infant mental health services, Scherz testified that there had been two specialists assigned and that there "have been some gaps in service due to the inappropriate nature of [respondent's] communication with the current infant mental health therapist." (*Id.* at 23.) Scherz stated that there "have been a couple of times when that therapist has not felt safe working with her and has asked that she continue to work on that communication with her individual therapist before resuming services, again." (*Id.*)

Scherz also addressed the parent-child bonding in her testimony. She acknowledged that respondent comes to the visits prepared and is very engaged and open with her daughter. (*Id.* at 25.) But "there continues to be tenuous bond" between mother and child. The child has a very difficult time transitioning into and out of visits and does not always appear to be comfortable with respondent. The child will look "at the visit door" rather than looking to respondent for comfort and the child will look to the workers that are outside that door. (*Id*.) Respondent continues to need assistance with basic care-taking tasks. (*Id*.) She has, however, been visiting consistently. (*Id.* at 30.)

The next witness was Catherine Guillen, also from Orchards Children's Services, who took over this case from Scherz. Guillen also observed that respondent came to visitation prepared and was engaged with the child. (*Id*. at 35.) But she also expressed the same concerns as Scherz regarding basic care-taking functions. (*Id.*)

Next, Cotrena Chambliss, an Infant Mental Health Therapist with Easter Seals testified. Those services were provided continuously since January 2020, except for two times, for over 60 days, that services were stopped due to respondent's "aggressive behavior." (*Id*. at 37-38.) Chambliss testified that the child is familiar with respondent and sits with her during visits. Respondent's ability to care for the child during visits "is fine with supervision and support," but that is where respondent "has struggled with the lack—lack of support outside of the visits" with the child. (*Id*.) Chambliss also expressed her concern with respondent's anger towards her and

other people and why respondent was angry and aggressive towards other people. (*Id.* at 39-40.) She was particularly concerned with whether frustration and anger would come out when alone with the child. (*Id*. at 40.)

The final witness was respondent. She disagreed with some of the previous testimony. For example, she said that she completed an online parenting class, though the certificate was on her other phone and could not show it. (*Id.* at 47.) Respondent acknowledged that Scherz informed her that that was not an approved parenting class. (*Id.* at 47-48.) She testified that she had made some efforts to secure suitable housing for her and the child, but had not secured anything at the time of the trial. (*Id.* at 48-49.) She stated that her case workers were aware of the reasons that she had trouble securing housing, but that their "job is to lie." (*Id.* at 49.) She acknowledged that she had some mental health diagnoses and had been prescribed "a whole list" of medications, but that she was only taking one of them at that time because she was pregnant. (*Id.* at 50.) When asked when she thought they would get to the end, she responded that "I really don't know, Judge." (*Id*. at 65.)

At the conclusion of the trial, the court terminated respondent's parental rights, opining as follows:

> As relates to mother, the Court finds there are statutory grounds, too, that exist. pursuant to MCL 712A19B3, C, I and J [sic]. Mother has failed to or has not engaged in services to address her mental health needs that would allow her to parent the chiId . . .who has her own special needs, and I think that is the biggest issues [sic] in this case. There has been a plethora of services offered to mother who as I indicated in my questioning of the mother at every juncture aside from her visits which at this moment, she still struggled with her confidence to properly care for [the child], but has been consistent with that she has been consistently visiting with the child. However, she still struggles at every juncture and aside from the housing, because the Court does understand that because of her past criminal history, it does prevent and creates tons of barriers for her to get housing, but that's not the main barrier. The main barrier is that mom, again, has not engaged in services to address her mental health needs that would allow her to care for this chi1d, who has her own special needs. We have to be mindful that this isn't a child, a regular child, child -- a normal child. This is a child with special needs, so, a child with special needs a more vigilant and a vigilant advocate on their behalf. Mother's anger has butted its head at each and every juncture, again, so, complied with the visits, but it had with every service provider, parenting classes, butted it head with the IMH, the individual therapists, the parents [sic] partners, the psychiatric evaluation and psychiatric services. It butted its head at every single juncture and to me, that is not a service provider or lack of service providers or lack of appropriate service providers presented to address her needs. It is mother. Mother has gotten in her own way.
>
> Now, the anger is beyond, and mother does not agree and that's fine, too -- it's beyond just being angry with the situation. It's explosive. It's threatening. It's beyond inappropriate, and again, it has gotten in the way and the fact that [respondent], you have not come to terms with what needs to be addressed here is

the problem. So, I disagree with [counsel's] statement that the agency has not provided accommodations for [respondent]. I think, they've done all that they can do in providing services for the mother and for that reason, the Court concludes that it is in this child's best interest that the mother's rights be terminated, because we can't go on and mother's own statement was she does not know when this will be to an end, because again, if you don't get the help that you need to address the front end, we are never going to get to the back end. [*Id*. at 74-76.]

Respondent's first issue on appeal is that the trial court erred in terminating her parental rights because inadequate efforts were made to achieve reunification of the family and appropriate services for the mother were not provided. We disagree.

Before terminating parental rights, reasonable efforts must be made to achieve reunification of the family. *In re Hicks/Brown*, 500 Mich 79, 85; 893 NW2d 637 (2017). As this Court observed in *In re Frey*, 297 Mich App 242, 247; 824 NW2d 569 (2012):

> While it is true that, with limited exceptions, "reasonable efforts to reunify the child and family must be made in all cases," MCL 712A.19a(2), respondents failed to object or indicate that the services provided to them were somehow inadequate, thereby failing to preserve this issue. "The time for asserting the need for accommodation in services is when the court adopts a service plan...." *In re Terry*, 240 Mich App 14, 27; 610 NW2d 563 (2000).

Respondent asserts in her brief on appeal, in very general terms, services that she now believes should have been provided. She does not, however, point to any place in the record where those requests were asserted when the service plan was being established. The trial court, as expressed in its opinion, did not believe that this was a case that could be solved by providing additional services.

Moreover, while she does assert that services that were supposed to be supplied were not actually provided, this is not supported by the record. A number of services were made available to respondent that she failed to take advantage of or were terminated because of her noncompliance, resistance, or hostility towards those attempting to supply those services. As we stated in *Frey*, 297 Mich App at 248:

> While the DHS has a responsibility to expend reasonable efforts to provide services to secure reunification, *there exists a commensurate responsibility on the part of respondents to participate in the services that are offered*. In this instance, services were proffered, but respondents failed to either participate or demonstrate that they sufficiently benefited from the services provided. [Emphasis added.]

As in *Frey*, respondent here failed to take advantage of the services offered. Simply put, respondent has not established that she would have participated in additional services or that any such services would have addressed the issues presented in this case.

Respondent next argues that there was insufficient evidence to establish the grounds for termination. Again, we disagree. Respondent's parental rights were terminated under both MCL

712A.19b(3)(c)(i) and (j). It is only necessary that one of the two grounds be established in order to justify the termination of parental rights, which the petitioner must establish by clear and convincing evidence. *In re Trejo Minors*, 462 Mich 341, 356; 612 NW2d 407 (2000). We review decisions terminating parental rights for clear error. *Id.*

Termination under subsection 18b(3)(c)(j) is proper where "there is a reasonable likelihood, based on the conduct or capacity of parent that the child will be harmed if they are placed in the home of the parent." Subsection 19b(3)(c)(i) provides that termination is appropriate where "182 days or more have elapsed since the issuance of an initial dispositional order," and that "the conditions that led to adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age." Respondent argues that this condition was not met because she had been compliant with the service plan and has made progress. We disagree.

First, and perhaps foremost, we note that 704 days passed from the time of the initial dispositional order and the entry of the order terminating parental rights, almost four times the 182-day statutory requirement. And although respondent claims that she has made progress, she does not point to any specific evidence to show that the conditions can be rectified within a reasonable time. Indeed, as the trial court noted in its opinion, when respondent was asked during her testimony when she thought it would come to end, she stated that she really didn't know. Given how much time had already passed, we can see why the trial court was skeptical that only a little more time would be required.

Second, respondent's claims regarding her compliance with the service plan and her progress are belied by the evidence. Respondent was given the opportunity to receive a number of services. She was referred to parenting classes at least nine times. (Tr 7/29/21, p 10.) She was also referred to Easter Seals, Macomb Oakland Regional Services (MORC), Infant Mental Health Services (IMH), and six referrals for a parent partner. (*Id.* at 13-14, 17, 23, 27, 37.)

Despite the numerous parenting class referrals, respondent failed to complete any of the classes. (Tr 7/29/21, p 10.) In some cases, the failure to complete was due to being removed from the class because of her behavior issues. Similarly, teaming respondent with a parent partner was also unsuccessful. Respondent refused to work with the first two parent partners that were assigned. (*Id.* at 17-18.) And when she was again referred for the service, the agency was reluctant to assign another parent partner because of respondent's aggressive behavior towards the first two. (*Id.* at 18, 27.) Respondent did contact MORC, but only asked for housing assistance and did not make an appointment for a full intake assessment in order to be assigned a service coordinator. (*Id.* at 14.)

Respondent did take advantage of the IMH therapy. The first therapist thought respondent needed more intensive services. (*Id.* at 28.) But things did not progress well with the second therapist, Cotrena Chambliss. Because of respondent's aggressive behavior, Chambliss stopped services twice (for a total of 60 days). (*Id.* at 38.) Ultimately, respondent contacted Chambliss's supervisor and said that she did not want Chambliss's services any longer. (*Id.* at 44.)

Chambliss's assessment of respondent's ability to care for the child is that she was "fine with supervision," but struggled with support outside of parenting time. (*Id.* at 38.) Chambliss

-5-

was concerned with respondent having unsupervised visitations because of her anger issues and Chambliss questioned what would happen if respondent was alone with the child. (*Id*. at 38, 40.)

Respondent received three referrals for individual therapy, but refused to participate. (*Id*. at 21.) She did sign up for therapy through Easter Seals, but did not benefit from those services. (*Id*. at 17-18, 21-23, 38-39, 42, 44, 48, 57-59.) Respondent had four different case managers as she eventually refused to work with each one. (*Id*. at 27.)

In sum, we are not persuaded that the trial court clearly erred in determining that the grounds for termination were established by clear and convincing evidence.

Respondent's final argument is that the trial court erred in terminating her parental rights because termination was not in the best interests of the minor child. Again, we disagree. This Court summarized the factors to be considered in determining the best interests of the child in *In re Olive/Metts Minors*, 297 Mich App 35, 41-42; 823 NW2d 144 (2012):

> In deciding whether termination is in the child's best interests, the court may consider the child's bond to the parent, see *In re BZ*, 264 Mich App 286, 301; 690 NW2d 505 (2004), the parent's parenting ability, see *In re Jones*, 286 Mich App 126, 129–130; 777 NW2d 728 (2009), the child's need for permanency, stability, and finality, see *In re VanDalen*, 293 Mich App 120, 141-142; 809 NW2d 412 (2011), and the advantages of a foster home over the parent's home, *In re Foster*, 285 Mich App 630, 634-635; 776 NW2d 415 (2009). "If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5); see also MCR 3.977(E)(4).

This Court identified additional factors in *In re White*, 303 Mich App 701, 714; 846 NW2d 61 (2014): "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption."

Respondent's argument focuses on the bond between her and the minor child, her compliance with the case service plan, and her visitation history with the child. But as already discussed above, the record does not support her accomplishments in these areas. In addition to what was already discussed above, Chambliss's testimony set out other problems with respondent and her interaction with the minor child. With respect to the bonding issue, the child was not always comfortable during visitations and often looked to the workers for comfort rather than to respondent. (Tr, p 25.) Respondent did not have a connection with child and needed constant redirection, which respondent resisted. (*Id*.) At each visit, respondent needed assistance with properly diapering and dressing her daughter. (*Id*. at 25, 30.) Chambliss also testified that respondent did not recognize when the child was tired and that respondent did not understand that the child was not making developmental progress, and that failure represented a safety issue. (*Id*. at 42-43.) By contrast, the child has been in a foster-care placement since 2019, with foster parents who wish to adopt her, and she has been receiving needed services, such as speech therapy. (*Id*. at 24.)

For these reasons, we are not persuaded that the trial court erred in concluding that it was in the child's best interests that respondent's parental rights be terminated.

Affirmed.

/s/ David H. Sawyer
/s/ Douglas B. Shapiro
/s/ James Robert Redford