*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* CAMPBELL, Minors.

UNPUBLISHED
September 14, 2023

No. 364817
Hillsdale Circuit Court
Family Division
LC No. 2021-000695-NA

Before: SWARTZLE, P.J., and O'BRIEN and FEENEY, JJ.

PER CURIAM.

Respondent-father appeals as of right the trial court's order terminating his parental rights to the minor children, AC and IC, under MCL 712A.19b(3)(c)(*i*), MCL 712A.19b(3)(c)(*ii*), and MCL 712A.19b(3)(j). We affirm.

## I. STANDARD OF REVIEW

"In order to terminate parental rights, the trial court must find by clear and convincing evidence that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been met." *In re VanDalen*, 293 Mich App 120, 139; 809 NW2d 412 (2011). After the trial court determines that at least one of the statutory grounds has been met, the trial court must also find by a preponderance of the evidence that termination is in the child's best interests before it can terminate parental rights. *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). This Court reviews the trial court's finding regarding the child's best interests for clear error. *In re Trejo*, 462 Mich 341, 356-357; 612 NW2d 407 (2000). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re Moss*, 301 Mich App at 80 (quotation marks and citation omitted).

## II. BEST INTERESTS

In his sole issue raised on appeal, respondent argues that the trial court erred by finding that termination of his parental rights was in the children's best interests.[1] We disagree.

"Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012), citing MCL 712A.19b(5). "[T]he focus at the best-interest stage" is on the children, not the parent. *In re Moss*, 301 Mich App at 87. The trial court should weigh all the evidence available on the record to determine the children's best interests. *In re Trejo*, 462 Mich at 356-357. The trial court may consider such factors as "the child's bond to the parent[;] the parent's parenting ability[;] the child's need for permanency, stability, and finality[;] and the advantages of a foster home over the parent's home." *In re Olive/Metts*, 297 Mich App at 41-42 (citations omitted). The trial court may also consider the parent's history and psychological evaluations, the child's age, inappropriate parenting techniques, as well as continued involvement in domestic violence relationships. *In re Jones*, 286 Mich App 126, 131; 777 NW2d 728 (2009). The strength of the bond between parent and child, the visitation history, the parents' questionable relationships, the child's well-being in care, and the possibility of adoption are also valid considerations. *In re BZ*, 264 Mich App 286, 301; 690 NW2d 505 (2004); *In re AH*, 245 Mich App 77, 89; 627 NW2d 33 (2001). Other considerations include the length of time that the children were in foster care or placed with relatives, the likelihood that "the child could be returned to her parents' home within the foreseeable future, if at all," and compliance with the service plan. *In re Frey*, 297 Mich App 242, 248-249; 824 NW2d 569 (2012). Further, the trial court must "consider the best interests of each child individually and . . . explicitly address each child's placement with relatives at the time of the termination hearing if applicable." *In re Olive/Metts*, 297 Mich App at 44.

First, respondent contends that the trial court simply indicated that the children's best interests supported termination without properly considering the best-interest factors. This contention is not supported by the record. The trial court determined that termination was in the best interests of AC and IC by comparing their joint placement in a foster home to placement in respondent's home. The trial court explained that AC and IC thrived in foster care, and they had a strong, healthy bond with their foster parents. Their foster parents tended to their significant special needs including therapy to address their sexual acting out, AC's aggression against other children at school, and IC's learning disabilities, PTSD and disinhibited social engagement disorder. Respondent did not attend their medical or school appointments, including IC's individualized educational plan meetings. In contrast, AC demonstrated an insecure attachment

---

[1] Because respondent does not challenge the statutory grounds for termination, this Court may presume that the trial court did not clearly err by finding that the unchallenged statutory grounds were established by clear and convincing evidence. See *In re JS & SM*, 231 Mich App 92, 98-99; 585 NW2d 326 (1998), overruled in part on other grounds *In re Trejo*, 462 Mich at 353. Nonetheless, we are satisfied from our review of the record that the trial court did not clearly err when it found that clear and convincing evidence existed to terminate respondent's parental rights under MCL 712A.19b(3)(c)(i).

to respondent, and IC did not have a bond with respondent. Additionally, the trial court explained that respondent made insufficient progress in addressing his barriers to removal to safely place his children back in his care. Finally, because of their ages (3 and 6.5 years old at the time of termination), multiple removals, and significant history of trauma, permanency was urgently needed for these children. For these reasons, the trial court determined that it was in the best interests of AC and IC to terminate respondent's parental rights. The trial court made express findings on the record regarding each child and explicitly considered relevant factors. See *id*.

Second, respondent contends that the best-interest factors favored him because *he* had a strong bond with his children; he had parenting ability because he parented the children since birth; and he had income, so he could provide permanency and stability. Additionally, he contends that that the home of a stranger had a serious disadvantage over his home because a father's love would be absent in a foster home. Finally, respondent asserts that he substantially complied with the parent-agency treatment plan.

Addressing, respondent's second argument, the trial court did not clearly err with respect to its best-interest analysis. The record suggests that he had no bond with one child and an inappropriate bond with the other. According to her attachment assessment, AC had an insecure ambivalent bond with respondent. According to her attachment assessment, IC had a secure bond with respondent; however, this bond was deemed inappropriate because of her disinhibited social engagement disorder diagnosis, which caused her to quickly attach to men, including complete strangers. It appears that respondent erroneously evaluated this factor from his perspective, not the children's. *In re Moss*, 301 Mich App ay 87.

In contrast, the children had no or little bond with respondent but had strong bonds with their foster parents. Initially, when AC and IC were placed with their foster parents, AC was afraid of men and would not let her foster father meet her needs. She quickly became attached to her foster mother but would scream when men attempted to help her. Throughout the course of these proceedings, AC and IC developed a significant bond with their foster parents. They referred to them as their "mommy" and "daddy," and referred to their mother and respondent as their "old mommy" and "old daddy." AC became comfortable with her foster father and allowed him to meet her needs.

Third, the record does not support the assertion that respondent had parenting ability simply because he raised them. Throughout this case, respondent showed that he did not develop appropriate parenting skills and could not meet his children's basic needs. Respondent participated in some services, but he failed to attend others, and did not learn from the services that he attended. For example, when respondent still had parenting time, he did not interact appropriately with his children. He needed to be coached during parenting-time visits and would ask AC questions that she was too young to understand and answer. Often, the caseworkers had to direct respondent's attention back to the children during visits. Respondent's caseworkers were surprised at how little progress he made during parenting visits considering that he had participated in Department of Health and Human Services (DHHS) services in past proceedings. Respondent also did not properly prepare for parenting-time visits. He sometimes brought pull-ups and wipes provided by the DHHS to parenting time, but he often relied on the foster parents to provide them. Additionally, he brought soda-pop, which was inappropriate given the children's serious dental

needs. Respondent did not follow through on promises he made, such as bringing presents for AC and IC.

Respondent never participated in his children's medical and educational appointments, even though the children's severe tooth decay and global developmental delays were conditions that led to the trial court taking jurisdiction over these children.[2] His house remained unsanitary and unsafe for children as well. Despite cleaning in preparation for a home visit, respondent still left marijuana, pills and a glass pipe out within the reach of his children in his household, the house was still unclean, and respondent permitted people subject to their own Children's Protective Services (CPS) investigations to live in the house. These examples showed that respondent did not develop the required skills to safely and effectively care for his daughters' basic needs. Respondent's failure to complete or comply with his parent-agency plan, including addressing his domestic violence history, negatively impacted his parenting skills.

Fourth, respondent did not explain how his source of income (approximately $800 per month) can provide permanency and stability for his children.[3] He cites no authority and makes no effort to explain how this criterion alone established that respondent could provide permanency and stability for his daughters. Beyond this, respondent was not forthcoming regarding his financial situation and ability to financially support his children. Despite being asked numerous times, respondent never provided his caseworker with his lease agreement. Respondent had $800 per month in income, was behind on his electricity bills, and his mother helped him pay for his car insurance. Respondent was offered financial resources by the DHHS, but he did not partake in those services.

Overall, respondent did not show that he could provide his children with permanency and stability through appropriate and safe housing. Throughout the case, his parenting skills did not improve, he did not obtain domestic violence counseling, he was untruthful with his substance abuse counselor, and his parenting time visits elicited traumatic, sexually disturbing responses from the girls that ceased after visits were suspended.

Fifth, respondent argues that the foster parents could not provide a father's love because they were not biological parents. This argument is disingenuous and unpersuasive. Respondent provides no citation for the argument that a foster parent is innately unable to provide a father's love to children. Looking at the record in this case, it is clear that this is not true with these children. AC and IC entered their foster family traumatized. AC was afraid of men and refused to let her foster father tend to her basic needs. The foster parents worked with the children's therapist to better understand trauma related to child sexual assault and to meet AC's and IC's needs. They made sure the children's medical and educational needs were met. The children

---

[2] Neither child was fully immunized and neither had attended any doctor's appointments after they were born. At removal, the children were 2 (IC) and 5 (AC) years old. IC needed root canal surgery, both girls needed cavities filled, AC had a yeast infection, and both had been struggling with head lice and bed bugs for several months.

[3] This is particularly true in light of respondent's admission that he consumes approximately six to seven joints a day or fifteen pounds of marijuana per month.

developed a significant bond with their foster parents. AC developed to a point at which she was no longer afraid of her foster father and allowed him to care for her. In contrast, respondent had an insecure ambivalent attachment with AC and an inappropriate attachment with IC.

The trial court's best-interest analysis was also supported by respondent's failure to comply with his parent-agency agreement. AC and IC were brought into the trial court's jurisdiction for failure to provide for their medical health, their emotional well-being, and their unfit home environment. To remedy his barriers to reunification, respondent was required to attend all parenting-time visits, as well as all medical, dental, education, and behavioral health appointments for AC and IC, comply with, and benefit from, parenting education, attend individual therapy, follow the recommendations in his psychological evaluation and to maintain suitable housing for his children.[4] Respondent did not substantially comply with these goals.

Respondent's parent-agency plan required respondent to attend and increase parenting-time visits. He did not attend all of his parenting-time visits and did not show progress in these visits. He needed to be coached during parenting-time visits and would ask AC questions that she was too young to understand and answer. Often, the caseworkers had to direct respondent's attention back to the children during visits. Notably, respondent completed his psychological evaluation and was diagnosed with bipolar with schizoaffective disorder and a cannabis-use disorder. The psychological evaluation recommended that respondent receive supervised and structured visitation, individual counseling, counseling with his girlfriend at the time, and domestic-violence counseling. He was also advised to stop marijuana use. Respondent complied with his plan to the extent that he participated in psychiatric care and was reported to take his medications. Otherwise, he failed to address his mental health. He did not participate in therapy services until April 2022. Respondent's therapist reported that he missed some appointments. His therapist readily admitted that she did not read respondent's psychological evaluation but they worked the most on his childhood trauma and sexual abuse. The trial court heard no evidence that respondent received any domestic violence, anger management, and relationship counseling. He did not request those services. Respondent also did not refrain from using marijuana. On the basis of this information, respondent did not comply with the requirements of his psychological evaluation.

Ultimately, the trial court reviewed the best interest factors and concluded by a preponderance of the evidence that termination was in the children's best interests. *In re Olive/Metts*, 297 Mich App at 40. The trial court's best-interest determination on the record does not leave a "definite and firm conviction that a mistake has been committed . . . ." *In re Moss*, 301 Mich App at 80 (quotation marks and citation omitted).

Affirmed.

/s/ Brock A. Swartzle
/s/ Colleen A. O'Brien
/s/ Kathleen A. Feeney

---

[4] At removal, the children's beds were covered in feces, the kitchen had black mold and there was garbage throughout the house. Respondent made some progress but the house remained dirty.