*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* WESTEN, Minors.

UNPUBLISHED
December 28, 2023

No. 364144
Ingham Circuit Court
Family Division
LC No. 19-000051-NA;
19-000495-NA; 20-000544-NA

Before: BORRELLO, P.J., and SWARTZLE and PATEL, JJ.

PER CURIAM.

Respondent-mother appeals as of right the order terminating her parental rights to JW, HW, and IW under MCL 712A.19b(3)(c)(*i*) (failure to rectify the conditions that led to adjudication) and (*ii*) (failure to rectify additional conditions), (g) (failure to provide proper care or custody), (h) (parent is imprisoned for such a period that the child would be deprived of a normal home for more than two years), (j) (reasonable likelihood of harm to the child if returned to the parent), and (m)(*i*) (parent was convicted of violations under MCL 750.316).[1] On appeal, respondent does not challenge the trial court's finding that statutory grounds for termination existed, nor does she challenge the court's finding that termination of her parental rights was in the best interests of the children. Instead, respondent argues that petitioner failed to make reasonable reunification efforts because its services did not accommodate her mental health disability. For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

In December 2018, Children's Protective Services (CPS) received a complaint alleging that respondent, while staying in a homeless shelter, tried to quiet seven-month-old JW's crying during the night by smothering her face with a pillow to the point that suffocation was likely to occur. A CPS worker interviewed a resident and two staff members of the shelter the same day. The staff reported that JW was crying late into the night and that respondent was not attending to her. The

---

[1] The parental rights of the children's legal father were also terminated, but he is not a party to this appeal.

staff also reported that respondent had been feeding JW only water without formula and that they suspected that respondent had not been feeding JW appropriately during her stay at the shelter. The staff also reported that respondent did not bathe JW appropriately while at the shelter. JW had a "soaking wet" diaper on the night of the incident. The shelter resident reported witnessing respondent holding a pillow over JW's face with one hand while looking around the room. When the resident made a noise to gain respondent's attention, respondent threw the pillow off of the bed. The shelter resident and shelter staff reported hearing respondent talk of battling voices in her head. The CPS worker also interviewed respondent, who reported that she had postpartum depression but denied hearing voices in her head or having any other mental health issues. Respondent denied that she tried to smother JW and claimed that she was playing "peek-a-boo" using the pillow.

CPS developed a safety plan and JW was voluntarily placed with her paternal grandfather so that respondent could undergo a psychological evaluation to determine whether respondent had any issues that would prevent her from being able to care for JW. On January 14, 2019, CPS received a report with the results of respondent's psychological evaluation. The evaluator noted several concerns, including respondent's self-reported mental and emotional deregulation. He noted that the available data did not indicate the presence of a major mental illness and that respondent self-reported postpartum depression. The evaluator opined that JW should not be returned to respondent's care until the concerns could be addressed and resolved. He recommended that respondent become involved in individual therapy to address the issues of concern and to provide a "clearer clinical picture." He also recommended that the medication that respondent was reportedly prescribed by her OB-GYN for postpartum depression be prescribed by a psychiatrist who would consult with the therapist.

On January 15, JW's paternal grandfather notified CPS that respondent had removed JW from her voluntary placement with him and had gone to a shelter. Petitioner, the Department of Health and Human Services (DHHS), petitioned for removal of JW from respondent's care the same day. The trial court entered an ex parte order to take JW into protective custody, finding that it was contrary to JW's welfare to reside in the home because of respondent's untreated mental health concerns and the alleged incident of physical abuse. The court also found that reasonable efforts were made to prevent removal. After a preliminary hearing, the court authorized the petition and JW was placed in a licensed foster care home.

At the time of the adjudication hearing in March 2019, respondent was pregnant. The CPS worker testified that respondent had a mental health history, that she was not working and did not have a lawful source of income, and that she was not following the recommendations from her psychological evaluation. Respondent was living with her stepfather in a one-bedroom apartment. She received cash assistance, but it was not enough for her to afford housing. The court found that respondent was not in a position to provide safe and proper care for JW for a number of reasons, including that she did not have safe and stable housing, that she did not have the financial ability to provide for JW's basic needs, and that she suffered from a "mental illness, which is depression." The court took jurisdiction over JW.

HW was born on April 5, 2019. DHHS petitioned to remove HW from respondent's care on April 11. The court took judicial notice of the history regarding JW's removal in January. A

CPS worker testified that respondent had not made much progress with services in her case with JW and had yet to benefit. The court authorized the petition.

Respondent did not appear for the adjudication trial for HW in May 2019. According to the foster care worker, respondent was not participating in any services to eliminate the barriers to reunification except parenting time. The worker testified that the barriers that prevented JW's reunification prevented placement of HW with respondent. The court took jurisdiction over HW. HW was placed in the same foster home as JW.

By the dispositional review hearing in November 2019 respondent had obtained housing that was appropriate for the children but needed some necessities, including a bed for JW. Respondent still had not followed up with Michigan Works. She had an intake appointment at the beginning of October with Professional Psychological Rehabilitation Services for individual therapy, but she missed the October 22 follow-up appointment. Respondent attended 20 out of the 25 parenting-time visits offered during the reporting period and the visits were appropriate. The court indicated that it would need reports from respondent's therapist indicating that respondent was addressing her mental health concerns and benefiting from services.

The court authorized DHHS to file a permanent wardship petition and to change the permanency planning goal to adoption after a combined disposition review and permanency planning hearing in January 2020. Evidence was presented that the barriers of mental health and financial stability were not well-addressed throughout the case and that respondent was not attending individual therapy or parenting class and had not obtained employment. Respondent's parenting time had been inconsistent over at least the last six months. In November 2019 respondent attended two parenting-time visits. Respondent visited the children one time in December. Respondent had not visited the children in more than a month. The foster care worker testified that the children were very young and any break in consistent parenting time could affect their bond with respondent. She also testified that early on in the case she and the visitation monitor took on more of a mentoring role and respondent was able to learn the skills that the worker would have wanted respondent to learn during a parenting class. Respondent interacted well with the children. The worker testified that the foster home was a preadoptive home. The court found that respondent was not addressing her mental health through therapy and was not making the children a priority. The court found that respondent was no better off than she was a year earlier. The court found that the permanency plan of reunification was no longer appropriate and changed the goal to adoption. The court authorized a petition for permanent wardship of JW and HW in February 2020.

Respondent's unaddressed mental health and employment remained the barriers at the June 2020 dispositional review hearing. Respondent still had not participated in therapy and did not follow up with any of the therapy providers offered by DHHS who accepted respondent's insurance. Because respondent was not participating in therapy, the psychiatrists were unwilling to perform a psychiatric evaluation.

IW was born on June 20, 2020. DHHS filed a petition on June 23 to remove IW from respondent's care. The trial court noted that respondent's two other children were in foster care and that a hearing on the supplemental petition to terminate respondent's parental rights to JW and HW was scheduled for September 2020. A CPS worker noted that respondent had mental health

concerns, that she had missed a lot of parenting time, and that she was not cooperating with services. The trial court authorized the petition. IW was placed in a different licensed foster home than JW and HW, but both sets of foster parents were willing to do sibling visits.

Respondent did not attend a dispositional review hearing for JW and HW in September 2020. According to the foster care worker, the only service that respondent had completed was a psychological evaluation. Her barriers remained mental health and employment. Respondent's parenting skills had improved and she had a better understanding of child development and stages, but she needed assistance with managing behaviors since she had three children. She was attending parenting time "for the most part."

Next, DHHS brought a petition to terminate respondent's parental rights. The trial court took jurisdiction over IW, but denied the petition to terminate respondent's parental rights to JW and HW. The court found that DHHS's proofs were insufficient to establish by clear and convincing evidence the statutory grounds for termination because DHHS failed to submit the psychological reports or the testimony of a psychologist regarding respondent's prognosis and failed to present proofs to support the allegation that respondent set the paternal grandmother's home on fire. The court found, however, that questions remained about respondent's parenting skills, emotional stability, and personality disorder and that returning the children to respondent "in light of their lack of therapy" was contrary to the children's best interests.

Dispositional hearings took place in February 2021 and March 2021, and a permanency planning hearing took place in May 2021. Respondent continued to participate in parenting classes and mental health therapy through the C.A.T.S. program, but the foster care worker had not received verification of any of the services or confirmation that respondent was benefiting from services. Respondent had signed a parent-agency treatment plan and was participating in virtual parenting time, because she was still housed at the county jail awaiting trial on charges of arson and open murder. According to the foster care worker, the visits were more beneficial for respondent than for the children because the children were too young to engage with respondent "on a computer screen." Respondent was appropriate during the visits, but the concern was the impact the visits had on the children. The children did not know respondent as "mom." According to the worker, there was a lack of bonding over the two and a half years that the case was open and there were gaps of two to three months without parenting time before the COVID-19 shutdowns occurred. The foster care worker testified at the May 2021 hearing that respondent's criminal trial was approaching and that DHHS would be filing another permanent wardship petition with respect to all three children. The court found that DHHS was making reasonable efforts but that respondent was incarcerated on serious charges and that the additional reporting period "has not resolved anything." The court ordered DHHS to file a supplemental petition. The court also suspended respondent's parenting time, finding that the court generally did not facilitate parenting time with incarcerated parents when the children are young as it is confusing and posed a risk of harm to the children's mental well-being.

The court held a hearing on the second supplemental petition to terminate parental rights to all three children on August 18, 2021.[2] Merridessa Catz testified that she performed a psychological evaluation on respondent in July 2019. Catz administered the standard tests for a psychological evaluation. She also administered a Kaufman Brief Intelligence Test because respondent said during her interview that she had special education services through eighth grade, and a Rorschach test because respondent said that she was diagnosed with schizophrenia in third grade. Respondent had a raw score of 13 on the Child Abuse Potential Inventory, which indicated that respondent was not being completely honest in her responses. On the Million Clinical Multiaxial Inventory (MCM13), which tested for personality disorders, respondent was extremely defensive in responding, tried to present herself in a favorable manner, and did not admit to typical faults and weaknesses that everyone has. According to Catz, the evaluation indicated that respondent is very rigid in her thinking, that she tries to stay rule-oriented, that she tries to keep her emotions under strict control, and that she suppresses anger. Respondent scored "average across the board" on the Kaufman Brief Intelligence Test. There was nothing noteworthy in her Rorschach interpretations; respondent was introspective and would tend to "just kind of smooth things over and say it will be fine." Respondent was diagnosed with a personality disorder. The interview and the testing together indicated that respondent had a potential for child abuse and neglect. The recommendations in the report included that treatment should be "active, direct, and preferably cognitive in nature." Catz believed respondent needed to complete cognitive behavioral treatment in order to be able to provide a safe home for her children.

Counsel for DHHS told the court that it intended to call respondent as a witness. The court said that it would instruct respondent that she had a Fifth Amendment right not to answer questions. The court said that the case was about what caused respondent to be incarcerated because "right now" her incarceration was a barrier to reunification. The court noted that it currently had the evidence that was lacking at the time of the hearing on the first supplemental petition—the psychological evaluations from 2019 or testimony from the evaluators—but it did not have any evidence regarding the criminal charges other than respondent's previous testimony that she did not commit any crimes. DHHS's counsel moved to withdraw the petition and indicated that DHHS would file another petition after respondent's criminal trial concluded.[3]

Respondent's criminal trial was adjourned because of an outbreak of COVID-19. Dispositional review hearings took place in October 2021 and January 2022. According to the foster care worker, respondent completed parenting classes in jail and was participating in mental health therapy through the C.A.T.S. program. The therapy notes were vague and lacked detail and so it was impossible for the worker to determine whether respondent was making progress in therapy. The worker recommended "another reporting period" because respondent's criminal trial was scheduled for April 7, 2022.

---

[2] The proceedings through this hearing also pertained to the children's father. The father's parental rights were terminated at this hearing.

[3] The hearing continued with respect to the children's father. The court found statutory grounds to terminate the father's parental rights and found that it was in the children's best interests to terminate his parental rights.

A third supplemental petition regarding all three children was authorized in May 2022 and a hearing on the petition was held in June 2022. Respondent's judgment of sentence was admitted. Respondent had been sentenced on June 8, 2022, to life without parole in prison for three convictions of first-degree murder and to a minimum prison term of 225 months for three convictions of first-degree arson. The foster care worker confirmed that respondent was convicted of setting fire to the children's paternal grandmother's home and that the grandmother and two of the children's cousins died in the fire. The worker testified that services were offered throughout the case, but respondent participated in mental health services and parenting classes only after she became incarcerated in jail more than a year and a half into the case. The therapist provided no confirmation whether respondent benefited from services. Because respondent had been incarcerated the entire time she participated in parenting classes, there was no way to measure her parenting skills. Respondent's parenting-time visits were sporadic before the COVID-19 shutdowns, and thereafter respondent failed to respond to 16 e-mails that were sent regarding alternative ways to engage in parenting time. Respondent participated in one out of 10 virtual parenting times that were offered after DHHS provided her with Wi-Fi passes. The worker testified that the Section 8 housing that respondent had obtained would no longer be appropriate for the children because the children's father, whose parental rights had been terminated, was on the lease. Respondent never obtained employment.

According to the worker, any bond that JW had with respondent was greatly diminished, and JW did not ask about respondent. HW was removed from respondent's care six days after birth and they did not have time to build a strong bond. IW never had a bond with respondent. The children were in foster homes that met their needs and the children visited each other frequently and had a relationship. Given the children's ages and the amount of time they had been in care, the worker believed that the children needed permanency, stability, and finality, and that it was in their best interests to terminate respondent's parental rights. There were no appropriate relatives who expressed interest in having the children placed with them.

The trial court found by clear and convincing evidence statutory grounds for termination of respondent's parental rights to the children under MCL 712A.19b(3)(c)(*i*) and (*ii*), (g), (h), (j), and (m)(*i*). The trial court also found that it was in the best interests of the children to terminate respondent's parental rights.

## II. REASONABLE EFFORTS

As previously noted, on appeal, respondent does not challenge the underlying factors that led to the trial court's termination of her parental rights. Respondent also does not challenge whether termination of her parental rights was in the best interest of the minor children. Rather, respondent confines her arguments on appeal to whether termination of her parental rights was improper because DHHS failed to make reasonable efforts toward reunification, and, in particular, failed to accommodate respondent's potential mental health disability as required by the Americans with Disabilities Act (ADA), 42 USC 12101 *et seq*.

To preserve an argument that petitioner failed to provide reasonable efforts toward reunification, the respondent must "object or indicate that the services provided to them were somehow inadequate." *In re Frey*, 297 Mich App 242, 247; 824 NW2d 569 (2012). The time for asserting the need for accommodation in services is when the court adopts a service plan or soon

afterward. *In re Atchley*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket Nos. 358502 and 358503); slip op at 2. "However, even if a parent does not object or otherwise indicate that the services provided were inadequate when the initial case services plan is adopted, such an objection or challenge may also be timely if raised later during the proceedings." *Id*. Likewise, a claim that DHHS failed to make accommodations consistent with the ADA must be raised in a timely fashion. *In re Terry*, 240 Mich App 14, 26 n 5; 610 NW2d 563 (2000).

Respondent does not claim to have raised this issue below, nor does she cite any portion of the record purporting to demonstrate that the issue was raised below. Because this issue is unpreserved, it is reviewed for plain error affecting substantial rights. *In re VanDalen*, 293 Mich App 120, 135; 809 NW2d 412 (2011). "Generally, an error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings*." In re Utrera*, 281 Mich App 1, 9; 761 NW2d 253 (2008).

In general, and except for certain enumerated circumstances not applicable in this case, the DHHS has an affirmative duty under Michigan's Probate Code, MCL 710.21 *et seq*., to make reasonable efforts to reunify a family before seeking to terminate parental rights. *In re Hicks/Brown*, 500 Mich 79, 85 & n 4; 893 NW2d 637 (2017), citing MCL 712A.18f(3)(b) and (c); MCL 712A.19a(2). Additionally, the DHHS "also has obligations under the ADA that dovetail with its obligations under the Probate Code." *In re Hicks/Brown*, 500 Mich at 86. As our Supreme Court explained, "Title II of the ADA requires that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.' " *Id*., quoting 42 USC 12132. "Absent reasonable modifications to the services or programs offered to a disabled parent, the Department has failed in its duty under the ADA to reasonably accommodate a disability." *Hicks/Brown*, 500 Mich at 86. Consequently, the Department has also "failed in its duty to make reasonable efforts at reunification under MCL 712A.19a(2)." *Id*. However, the ADA does not provide a defense to proceedings to terminate parental rights. *Terry*, 240 Mich App at 9. "While [DHHS] has a responsibility to expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of respondents to participate in the services that are offered." *Frey*, 297 Mich App at 248. In order to prevail on an argument that reunification efforts were inadequate, a respondent must establish that he would have fared better if other services had been offered. See *In re Fried*, 266 Mich App 535, 543; 702 NW2d 192 (2005). This includes identifying the services that DHHS should have provided to accommodate the parent's specific needs. See *In re Sanborn*, 337 Mich App 252, 266; 976 NW2d 44 (2021).

Here, DHHS identified emotional stability as a barrier to reunification after respondent allegedly tried to smother JW and reported that she was suffering from postpartum depression. The trial court record reveals that there was some reason to suspect that respondent may have a mental health disability. However, respondent did not raise this issue in the trial court, and consequently, there is no record to support that mother needed a reasonable accommodation or that reasonable accommodations were denied to mother that would have allowed her to fare better.

The report from respondent's first psychological evaluation noted that respondent self-reported mental and emotional dysregulation, but stated that none of the available data reflected on the presence of a major mental illness. The report indicated only that respondent self-reported

postpartum depression. The report recommended individual therapy, psychiatric evaluation, and management of respondent's medication by a psychiatrist. DHHS created a service plan that included services to implement these recommendations. See *Hicks/Brown*, 500 Mich at 85-86 ("As part of these reasonable efforts, the department must create a service plan outlining the steps that both it and the parent will take to rectify the issues that led to court involvement and to achieve reunification."). Numerous services were offered to respondent that could have potentially been of benefit to her, including a psychological evaluation, individual mental health therapy, and parenting classes. DHHS made a referral for a psychiatric evaluation to determine "what issues need to be addressed through medication," as recommended by the first psychological evaluation. DHHS referred respondent for a second psychological evaluation in July 2019. Although the second psychological evaluation indicated that respondent reported that she attended special education through eighth grade and that she was diagnosed with schizophrenia in third grade, the second psychological evaluation showed only that respondent had a personality disorder. There was no mention of schizophrenia or a learning disability. The second psychological evaluation indicated that respondent had average intelligence. The record in this case does not clearly define the exact nature or extent of respondent's disability, if any. For example, although the second psychological evaluation documented mother's self-reported information about special-education classes and a diagnosis of schizophrenia, the evaluation did not make any specific recommendations for accommodations for respondent. It is unclear whether respondent had a disability, and respondent has provided no evidence of specific services that would have benefited respondent but were not provided to her. Cf. *Sanborn*, 337 Mich App at 266 ("Unlike *In re Hicks*, the record does not establish that there were specific services that the DHHS failed to provide. Instead, mother has failed to identify what services the DHHS should have provided to accommodate her specific needs."). Respondent has not otherwise explained how the services that were provided to her were not reasonable or appropriate for her.

Even if we were to presume respondent suffered from a mental health disability under the Act, the record reveals that she was offered numerous services throughout the proceedings to treat respondent's mental health issues. Ultimately, it was respondent who refused to participate in the services offered to her. For example, individual mental health counseling was recommended and DHHS made referrals for therapy. Respondent's participation in mental health therapy was limited to one intake appointment with a therapist. DHHS referred respondent for a psychiatric evaluation as recommended to determine whether respondent had mental health issues that could be addressed through medication, but none of the psychiatrists would agree to perform a psychiatric evaluation unless respondent was participating in individual therapy. By refusing to participate in individual therapy, respondent prevented further relevant psychiatric services from being implemented.

On appeal, respondent offers a number of services that she suggests DHHS could have offered to accommodate her disability. She refers to literature concerning depression in general that is not part of the lower court record that forms the basis for this Court's review, see MCR 7.210(A)(1), and speculates that additional services could have been provided. The record, however, does not support that respondent suffered from depression. Even assuming that respondent did suffer from depression, there is no basis to conclude that these services were suitable for respondent in particular. Without more information in the record, this Court is left to simply speculate that there were other services that DHHS could have offered. Such speculation is not sufficient to show that mother would have fared better with different services, and it is not

sufficient to establish plain error. See *Sanborn*, 337 Mich App at 264-266. Respondent has not identified any plain errors involving the ADA or DHHS's reasonable efforts.

Affirmed.

/s/ Stephen L. Borrello
/s/ Brock A. Swartzle
/s/ Sima G. Patel