*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* J. L. CRUMBEY, Minor.

UNPUBLISHED
June 13, 2025
9:25 AM

No. 372280
Wayne Circuit Court
Family Division
LC No. 2023-000742-NA

Before: MALDONADO, P.J., and M. J. KELLY and RIORDAN, JJ.

PER CURIAM.

Respondent appeals as of right the order terminating his parental rights to his child, JC, under MCL 712A.19b(3)(b)(*i*), (j), (k)(*ii*), and (k)(*ix*). For the reasons stated in this opinion, we affirm.

## I. BASIC FACTS

This case arises from respondent's sexual abuse of JC's half-sister. At the adjudication trial and dispositional hearing, JC's half-sister testified that respondent would perform daily "body evaluations" on her. She explained that respondent would call her into a back room to check and see if anyone was "messing" with her. He would check under her shirt and bra and inside her pants and underwear. During the examinations, he would sometimes touch her breasts. She also disclosed to a caseworker that respondent once "spread her butt checks" apart during an examination. JC's half-sister further explained that respondent would kiss her on the mouth and that he would check on her while she was showering. Although she did not need assistance, he shaved under her arms once. On another occasion, after she finished showering, he told her to get dressed in his bedroom. When she entered, he was only wearing underwear and directed her to sit on his lap. The contact made her feel weird and uncomfortable. Although another of JC's siblings testified that it was "normal" in their family for respondent to kiss the children on the lips, she also stated that it had recently stopped. She also corroborated JC's half-sister's testimony that respondent shaved her armpits.

-1-

A caseworker testified that respondent admitted to kissing JC's half-sister on the mouth, but that he denied the balance of the allegations. At trial, respondent's lawyer suggested that respondent was just interested in helping JC's half-sister maintain good hygiene. He also elicited testimony from JC's half-sister that she was upset that he did not allow her to wear an expensive necklace that she had received as a gift. He suggested that was the reason that JC's half-sister fabricated the allegations against him.

Based upon the testimony, the trial court found statutory grounds to take jurisdiction over JC and his older half-brother, CC. Further, the court found that there were statutory grounds to terminate respondent's parental rights to both children.

At the time of the termination hearing, JC and CC were living with their respective mothers. CC, who was 17 years of age, testified that he did not want respondent's parental rights to him to be terminated. He stated that he loved respondent and wanted to see him on a daily basis. Based upon that testimony, the trial court found that it was not in CC's best interests for respondent's parental rights to be terminated.

JC was 7 years of age at the time of the termination hearing. He was living with his half-sister, his half-brother, and his mother. Although he enjoyed spending time with respondent, he was unaware that respondent had sexually abused his half-sister. His mother testified that the visits were "fine," but that the contact between respondent and JC caused friction in the household. JC's half-sister felt isolated when everyone would go to visit respondent, and JC would question why his half-sister did not go with them on the visits. She explained that she had divorced respondent, but that no custody order had been entered. JC's mother indicated that she would not seek to bar respondent from contact with JC if the court opted to not terminate respondent's parental rights, but she stressed that it was a difficult situation given that respondent had sexually abused JC's half-sister with whom JC was living. JC's mother added that she was capable of meeting all of JC's needs. Based upon the testimony presented, the trial court found that it was in JC's best interests to terminate respondent's parental rights. This appeal follows.

## II. BEST INTERESTS

### A. STANDARD OF REVIEW

Respondent argues that the trial court erred by finding that it was in JC's best interests to terminate his parental rights. We review the trial court's findings on the best interests of a child and its final determination for clear error. *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). Clear error exists if this Court is left with a definite and firm conviction that the trial court made a mistake. *Id*. at 709-710.

### B. ANALYSIS

The trial court must find that termination is in a child's best interests by a preponderance of the evidence. *In re Sanborn*, 337 Mich App 252, 276; 976 NW2d 44 (2021). "The focus at the best-interest stage has always been on the child, not the parent." *In re Atchley*, 341 Mich App 332, 346; 990 NW2d 685 (2022) (quotation marks and citation omitted). The trial court is tasked with reviewing "all evidence available to it." *Id*. In doing so, the court may consider:

the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. Other considerations include the length of time the child was in care, the likelihood that the child could be returned to her parents' home within the foreseeable future, if at all, and compliance with the case service plan. [*Id*. at 346-347 (quotation marks and citation omitted).]

A child's placement with his or her siblings may also be considered. *In re Olive/Metts*, 297 Mich App 35, 42; 823 NW2d 144 (2012). Likewise, the court may consider the child's safety and well-being when making a best-interests determination. *In re VanDalen*, 293 Mich App 120, 142; 809 NW2d 412 (2011).

Respondent argues that the trial court erred by failing to conduct an individualized best interests evaluation for JC. He also maintains that CC was similarly situated to JC in "every respect except for his age." We disagree.

The trial court considered the best interests of each child separately. In doing so, the court recognized that both children had a strong bond with respondent. However, CC was almost 18 years of age, but JC was only 7 years old. CC was made aware that respondent had sexually abused JC's half-sister and he was old enough to make his own determination as to what level of contact he wished to maintain with respondent. Given JC's young age, he was not told that respondent had sexually abused his half-sister. Further, although he had a bond with respondent, given his age and lack of awareness of respondent's sexual abuse, the trial court did not err by not inquiring into his preference. Next, although both children were living with their mothers rather than with respondent, that was the only similarity in their living arrangements. JC was living with his half-sister, the child that respondent had sexually abused. Thus, in JC's case, a relevant consideration was the impact that continued contact between JC and respondent would have on the family dynamic. Indeed, JC's mother testified that the visits between JC and respondent led JC's half-sister to feel isolated and led JC to ask questions regarding why his half-sister was being left out from the visits. The court found that the negative impact on the family dynamic weighed in favor of finding that termination of respondent's parental rights was in JC's best interests.

In light of the foregoing, it is clear that the trial court took an individual approach to determining whether termination of respondent's parental rights was in the children's best interest. It found that, given the differences in the children's ages and living situations, it was in JC's best interests to terminate respondent's parental rights, but that it was not in CC's best interests to do so. The trial court's findings were not clearly erroneous.

Affirmed.

/s/ Michael J. Kelly
/s/ Michael J. Riordan